**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ronald Irving PETERS, Defendant–Appellant.**

**No. 90–3488.**

United States Court of Appeals, Seventh Circuit.

Argued June 18, 1991.

Decided Jan. 2, 1992.

Certiorari Denied March 2, 1992. See 112 S.Ct. 1277.

Lisa K. Osofsky, Crim. Div., Kathleen T. Murdock, Asst. U.S. Atty. (argued), Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Robert A. Korenkiewicz, Chicago, Ill. (argued), for defendant-appellant.

Before BAUER, Chief Judge, COFFEY and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Ronald Irving Peters appeals his convictions for conspiring to transport a stolen vehicle in interstate commerce in violation of 18 U.S.C. § 371 and for transporting a stolen truck in interstate commerce in violation of 18 U.S.C. § 2312. On appeal, Mr. Peters challenges only the jurisdiction of the federal district court. He claims that federal law enforcement officials manufactured jurisdiction by inducing him to drive the stolen vehicle across the Illinois/Indiana state line.[1] For the following reasons, we affirm.

## I

## FACTS

### A. *Background*

In response to the growing number of interstate truck thefts originating in the Chicago area, the Federal Bureau of Investigation (FBI) began an investigation known as "Tracpac." As part of this investigation, the FBI needed to find a location for an "off-site," which is a "front" business set up by the government as part of the agents' cover. An off-site in Merrillville, Indiana was chosen, according to the government, for several reasons. The undercover agent originally assigned to the Tracpac operation was from Indiana, and his familiarity with the vicinity of the off-site made his cover story more believable. Also, the Chicago area truck theft rings were a very close knit group, and the agents feared that they could not infiltrate this group and retain their cover. Having the thief drive a stolen vehicle to the off-site also protected the undercover identity of the agent, which could be jeopardized if local law enforcement stopped him while he was driving a stolen vehicle. Finally, the location of the off-site just across the state line provided a convenient means of ensuring federal jurisdiction because truck thieves could be asked to drive stolen vehicles from Illinois to the Indiana off-site.[2]

FBI Agent Ronald Poole posed as a fence in the Tracpac investigation. Co-defendant Tommy Woods[3] was a middle man for Agent Poole. He would refer truck thieves to fences in return for a "finder's fee." Woods and Agent Poole had negotiated several deals before Woods introduced Mr. Peters to Agent Poole.

### B. *Mr. Peters' Involvement*

Mr. Peters was a truck driver for Central Steel Transport International (CRST). On July 25, 1986, Mr. Peters was involved in an accident in Plainfield, Illinois. The trailer of CRST's truck was wrecked. Suspecting he would be fired because of the accident, Mr. Peters decided to sell the truck's tractor, which had survived the accident. Mr. Peters met Woods, who agreed to help him sell the stolen truck through a fence Woods knew who operated out of Indiana. That fence turned out to be Agent Poole.

On the morning of July 29, 1986, Agent Poole met with Woods who showed him the truck that Mr. Peters wished to sell. During this conversation, Woods assured Agent Poole that Mr. Peters would drive the stolen truck to Indiana. At first, believing that the truck was an "insurance give-up" rather than a stolen vehicle, Agent Poole said he would drive it to Indiana himself. When he realized that the truck was stolen, he arranged with Woods for Mr. Peters to drive the truck to Indiana. That afternoon, Mr. Peters, Woods, Agent Poole, and Mr. Peters' friend, William Moore, met at Woods' junkyard in Chicago. During their conversa-

---

1. Mr. Peters pleaded guilty in the district court but reserved the right to appeal the adverse ruling on the jurisdictional issue.

2. In addition to outright thefts, the FBI also investigated "insurance give-ups," in which the owner of a truck sells it to a fence and later reports it stolen in order to collect from his insurance company. In insurance give-ups, the truck owner was not asked to drive the truck to Indiana, because federal jurisdiction was created through the mail fraud statute, and because the undercover agent did not need to worry about being arrested by local police since the truck had not yet been reported as stolen.

3. Woods, Moore, and Peters were co-defendants in the criminal proceedings at the district court level. However, neither Woods nor Moore joins in this appeal.

tion, Mr. Peters told Agent Poole that this was the first time that he had ever stolen a truck. Mr. Peters discussed the possibility of organizing a nationwide truck theft ring and offered to steal trucks from anywhere to bring to Indiana. Mr. Peters also stated that he would not steal trucks from Indiana as he had been told that Poole did not want to handle trucks stolen from Indiana. Mr. Peters, Woods, and Agent Poole also discussed the purchase price of the stolen tractor and agreed that Poole would buy it for $3,500. Woods would receive $500 of this money as a "finder's fee." Finally, the parties discussed the best route to the drop-off point, a K–Mart in Merrillville, Indiana, approximately ten miles east of the Illinois border. Mr. Peters vetoed the original route because CRST had a station on that highway. It was agreed that a longer route should be taken to avoid detection by CRST.

The foursome left the junkyard and went to a nearby truckstop where the tractor was parked. Mr. Peters drove the stolen tractor. Moore drove another car in order to take Mr. Peters back to the Chicago area. Agent Poole was also part of this caravan to Indiana.

## II

## ANALYSIS

Mr. Peters contends that the government improperly manufactured federal jurisdiction over him by inducing him to drive the stolen truck across the state line into Indiana and that the case against him should have been dismissed.[4] In support of his contention, he relies upon *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973).

In *Archer*, federal agents investigating corruption in the New York criminal justice system arranged the sham arrest and arraignment of an undercover agent, who then made it known that he would pay to avoid trial or conviction. Archer, a local district attorney, took the bait and accepted a bribe. Belatedly realizing that there was no basis for federal jurisdiction, the agent made a telephone call from out-of-state to Klein, a lawyer conspiring with Archer. Klein returned his call, and, on the basis of that return call, the government prosecuted Archer and his co-defendants in federal court for using a facility in interstate commerce (the telephone) in violation of the Travel Act, 18 U.S.C. § 1952. The Second Circuit dismissed the case, holding that

> when Congress responded to the Attorney General's request to lend the aid of federal law enforcement to local officials in the prosecution of certain crimes, where the participants were engaging in interstate activity, it did not mean to include cases where the federal officers themselves supplied the interstate element and acted to ensure that an interstate element would be present.

*Archer*, 486 F.2d at 682. The court concluded that federal officials had artificially manufactured federal jurisdiction because the out-of-state calls "served no purpose that would not have been equally served by a call from New York." *Id.* at 683.

This circuit has addressed *Archer* only on a few occasions.[5] Summing up our own and other circuits' decisions on the issue, we stated in *United States v. Podolsky*, 798 F.2d 177, 181 (7th Cir.1986) (citing cases), that the "course of decisions casts doubt ... on the vitality of the independent principle announced [in *Archer*] that forbids the 'manufacture' of federal jurisdiction in circumstances not constituting entrapment and not canceling any element of the crime such as criminal intent." *See also United States v. Petit*, 841 F.2d 1546, 1553 (11th Cir.) (following *Podolsky*), *cert. denied*, 487 U.S. 1237, 108 S.Ct. 2906, 101

---

4. Peters' substantive conviction was for violating 18 U.S.C. § 2312, which reads: "Whoever transports in interstate or foreign commerce a motor vehicle or aircraft, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

5. *Archer* has also been cited by this court for the proposition that truly outrageous government conduct could amount to a due process violation requiring the reversal of a conviction. *See United States v. Kaminski*, 703 F.2d 1004, 1009 (7th Cir.1983) (government conduct found to be reasonable).

L.Ed.2d 938 (1988). Nonetheless, the possibility that a case might arise where federal jurisdiction would be inappropriate because it was "manufactured" has not been completely foreclosed. *See United States v. Muskovsky*, 863 F.2d 1319, 1326 (7th Cir. 1988), *cert. denied*, 489 U.S. 1067, 109 S.Ct. 1345, 103 L.Ed.2d 813 (1989). We do not foreclose it now; yet we cannot agree with Mr. Peters that in the present case federal jurisdiction was inappropriate because "manufactured." Several reasons, all grounded in our case law, compel this conclusion.

1.

■ Mr. Peters freely and voluntarily drove his stolen truck from Illinois to Indiana. The federal element necessary for jurisdiction was not "furnished solely by undercover agents." *Archer*, 486 F.2d at 686; *United States v. Gardner*, 516 F.2d 334, 345 (7th Cir.) (FBI informant arranged meeting with defendant in Chicago to dispose of securities stolen in New York; court rejected defendant's argument that *Archer* mandated dismissal), *cert. denied*, 423 U.S. 861, 96 S.Ct. 118, 46 L.Ed.2d 89 (1975). Agent Poole did not "act to ensure jurisdiction;" he merely furnished the defendant with "an opportunity to complete [his] scheme." *Gardner*, 516 F.2d at 344.[6] Mr. Peters showed no reluctance in joining a conspiracy that would result in his stolen truck being transported out of Illinois; when asked, he did not hesitate to transport it out of Illinois himself. In *Gardner*, we noted that the defendant "did not consider himself limited by any particular

boundaries, but desired to dispose of the Treasury bills wherever the opportunity arose. The Government merely afforded the opportunity, and the defendant chose to seize it." *Gardner*, 516 F.2d at 544 (citing *United States v. Edwards*, 366 F.2d 853, 867–68 (2d Cir.1966), *cert. denied*, 386 U.S. 908, 87 S.Ct. 852, 17 L.Ed.2d 782 (1967)). In the present case, there is no evidence that Mr. Peters felt himself limited by any particular boundary; he desired to dispose of the truck where the opportunity arose. Indeed, Mr. Peters made it clear to Agent Poole that he desired to engage in ongoing interstate criminal activity. The fact that the agents "steered" Mr. Peters "to commit a crime within federal jurisdiction" rather than hand him over to Chicago police does not render federal jurisdiction inappropriate. *Podolsky*, 798 F.2d at 180–81.

2.

The intrusive use of federal power was a factor in the *Archer* decision. In *Archer*, federal agents deceived the state's police, courts, and a grand jury. In the words of the *Archer* court, they "displayed an arrogant disregard for the sanctity of the state judicial and police processes." *Archer*, 486 F.2d at 677. There was no such abuse here. *Cf. United States v. Anderson*, 809 F.2d 1281, 1288 (7th Cir.1987); *Podolsky*, 798 F.2d at 181.

■ Mr. Peters contends that the FBI's creation of federal jurisdiction by inducing him to cross a state line is an example of "wrongful usurpation" by the federal government of local police power, of feder-

---

**6.** Other circuits have also found an *Archer* defense inapplicable when the defendant freely participates in the jurisdictional act. *See United States v. Faison*, 679 F.2d 292 (3d Cir.1982) (*Archer* inapplicable when interstate phone calls placed at the behest of the defendant); *United States v. McLernon*, 746 F.2d 1098 (6th Cir.1984) (proof of on-going conspiracy with international source defeats any suggestion of improper interjection of jurisdiction by the government); *United States v. Brooklier*, 685 F.2d 1208 (9th Cir. 1982) (both defendants and federal agents engaged in interstate conduct), *cert. denied*, 459 U.S. 1206, 103 S.Ct. 1194, 75 L.Ed.2d 439 (1983); *United States v. Esch*, 832 F.2d 531 (10th Cir. 1987) (defendants willingly corresponded through interstate mailings), *cert. denied*, 485

U.S. 908, 108 S.Ct. 1084, 99 L.Ed.2d 242 (1988); *United States v. Smith*, 749 F.2d 1568 (11th Cir.) (defendant initiated out-of-state travel), *cert. denied*, 471 U.S. 1137, 105 S.Ct. 2680, 86 L.Ed.2d 698 (1985). The Fourth Circuit applied *Archer* in a case where the interstate nexus was wholly attributable to federal agents. *See United States v. Brantley*, 777 F.2d 159 (4th Cir.1985), *cert. denied*, 479 U.S. 822, 107 S.Ct. 89, 93 L.Ed.2d 42 (1986). In *Brantley*, the FBI set up a gambling den with out-of-state equipment and liquor and bribed local officials to overlook the illegal activity. The only interstate elements, the equipment and the liquor, were furnished solely by federal agents and were held insufficient to establish federal jurisdiction under the Hobbs Act.

al intervention into "purely local affairs" and a completed "local transaction." Appellee's Br. at 11–14. We cannot agree. The federal agents did not transform a purely local affair into a federal crime. As the district court found, although "a major, if not the primary, reason for locating the undercover operation's base in Indiana rather than Illinois was to obtain federal jurisdiction over truck thefts occurring in the Chicago area," there was also evidence that

> the agent originally assigned to this operation had ties to Indiana, in particular to Indianapolis, so that a cover story with an Indiana background was easier, more plausible, and safer for him to use. Moreover, there was evidence that having Peters drive the truck from Chicago to Indiana was in keeping with the character the undercover agent was portraying and the operation; in other words, it was how a real stolen truck fence and fencing operation might be expected to act.

*U.S. v. Moore,* 735 F.Supp. 902, 903 (N.D.Ill.1990). *Cf. United States v. Garrett,* 716 F.2d 257, 267 (5th Cir.1983) (fictitious insurance agency set up by agents in California partly because of informant's California connections), *cert. denied,* 466 U.S. 937, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984). Given these important considerations of agent safety and operational effectiveness, we cannot say that the agent's decision to have Mr. Peters drive the stolen truck to Indiana had as its sole purpose the manufacturing of federal jurisdiction, bringing the case under the ambit of *Archer.*

### 3.

The *Archer* court was also concerned that federal agents had exceeded the purpose of the Travel Act, which was, according to the court's reading of the legislative history, to enable federal agents to target organized crime where the " 'top men' of a given criminal operation resided in one state but conducted their illegal activities in another." *Archer,* 486 F.2d at 679. The *Archer* court was of the view that, in light of its narrow purpose, "the reach of the Travel Act 'was not to be stretched to the limits of its language.'" *United States v. Anderson,* 809 F.2d 1281, 1288 (7th Cir. 1987) (quoting *Archer,* 486 F.2d at 680).[7] In contrast to the Travel Act, section 2312, under which Mr. Peters was convicted, and similar sections such as 18 U.S.C. § 2314 have been interpreted broadly. *See McElroy v. United States,* 455 U.S. 642, 655, 656 n. 21, 102 S.Ct. 1332, 1339, 1340 n. 21, 71 L.Ed.2d 522 (1982); *United States v. Turley,* 352 U.S. 407, 414 & n. 13, 77 S.Ct. 397, 401 & n. 13, 1 L.Ed.2d 430 (1957) (discussing "broad terms" in which Congress stated object of Dyer Act, of which 18 U.S.C. § 2312 and § 2314 are part, and rejecting narrow construction of "stolen"). In regard to section 2314, which governs transportation of stolen goods in interstate commerce, the Supreme Court observed that Congress " 'contemplated coming to the aid of the states in detecting and punishing criminals whose offenses are complete under state law, but who utilize the channels of interstate commerce to make a successful getaway and thus make the state's detecting and punitive processes impotent.'" *McElroy,* 455 U.S. at 654, 102 S.Ct. at 1339. The Court rejected a construction of the statute that would "hobbl[e] federal prosecutors in their effort to combat crime in interstate commerce."[8] *Id.* at 655, 102

---

**7.** Not all courts have agreed with the Second Circuit's narrow construction of the Travel Act. *See, e.g., United States v. Perrin,* 580 F.2d 730, 733, 735 n. 16 (5th Cir.1978), *aff'd,* 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). In *Anderson,* we observed that "the *Archer* court made clear that it interpreted the Travel Act narrowly partly because of the intrusive use of federal power in that case." *United States v. Anderson,* 809 F.2d 1281, 1288 (7th Cir.1987). *Anderson,* which declined to apply *Archer* in a case under the mail fraud statute, contrasted the

broad reach of that statute with the Second Circuit's narrow reading of the Travel Act. *Id.*

**8.** Discussing both section 2312 and section 2314, the Court noted that the phrase "in interstate commerce" used in those sections is defined more broadly than merely crossing state lines, *McElroy,* 455 U.S. at 654 n. 18, 102 S.Ct. at 1339 n. 18, and cited *Barfield v. United States,* 229 F.2d 936 (5th Cir.1956), a case under section 2312, for the proposition that "any driving, whether wholly within the state of origin, state

S.Ct. at 1339. In view of the Supreme Court's characterization of the purposes of these sections and its broad interpretation of the phrase "transport in interstate commerce," it is clear that the federal/state concerns of the *Archer* court are not at issue under the circumstances of the present case.

### Conclusion

In short, especially when viewed in light of the broad purpose of section 2312, the circumstances of the present case, including Mr. Peters' willing participation in the jurisdictional event and the other purposes for the government's inducing Mr. Peters to drive across the state line into Indiana, do not justify dismissal under the principles relied upon by the Second Circuit in *Archer.*

For the foregoing reasons, the decision of the district court is affirmed.

AFFIRMED.

of destination, or from and to, if done as a substantial step in the furtherance of the intended interstate journey is, we think, within the act." *McElroy,* 455 U.S. at 657 n. 21, 102 S.Ct. at 1340 n. 21. The government does not ask us to reach the issue of whether federal jurisdiction would have existed even if Mr. Peters had not made the drive to Indiana, but had merely driven the truck to the Illinois meeting place with Agent Poole, with the knowledge that Poole would then transport the truck to Indiana. We note that, if the transaction had gone as Mr. Peters intended, Mr. Peters' efforts to avoid detection presumably would have been furthered by the truck's removal from the vicinity of the theft.