* Chief Judge William J. Bauer and Circuit Judges Joel M. Flaum, Kenneth F. Ripple and Ilana

WELLFORD, Senior Circuit Judge, concurring:

As indicated in my initial separate opinion, I find this to be a very close case. *United States v. Chan Chun–Yin*, 958 F.2d 440 (D.C.Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 3010, 120 L.Ed.2d 884 (1992), is a basis for finding that the omission in the jury instruction may be harmless error. I find an insufficient basis to dissent from denial of a rehearing, but the court may deem it a proper candidate for rehearing en banc, because this controversy involves a statute and an interesting issue not previously considered by the Sixth Circuit.

This court "should not exercise [its] discretion [to correct the forfeited error] unless the error '*seriously affect*[s] the fairness, integrity or public reputation of judicial proceedings.' *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936))." *United States v. Olano & Gray*, —— U.S. ——, ——, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993) (emphasis added). I am not sure that the error in jury instruction did seriously or necessarily affect the fairness and integrity of the proceedings against Wuliger, an experienced trial counsel.

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**David J. SHIELDS and Pasquale F.
DeLeo, Defendants–Appellants.**

**Nos. 92–1683, 92–2237.**

United States Court of Appeals,
Seventh Circuit.

Argued March 30, 1993.

Decided July 14, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 27, 1993.*

Diamond Rovner took no part in the consideration or decision in this matter.

Barry R. Elden, Asst. U.S. Atty., Mark S. Hersh (argued), Crim. Receiving, Appellate Div., Chicago, IL for plaintiff-appellee in No. 92–1683.

Dan K. Webb (argued), Steven F. Molo, James F. Hurst, Timothy P. O'Connor, Winston & Strawn, Chicago, IL, for defendant-appellant in No. 92–1683.

Michael J. Shepard, Asst. U.S. Atty., Crim. Div., Barry R. Elden, Asst. U.S. Atty., Mark S. Hersh (argued), Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee in No. 92–2237.

Allan A. Ackerman (argued), Joelle Hollander, Samuel V.P. Banks, Law Offices of Samuel V.P. Banks, Chicago, IL, for defendant-appellant in No. 92–2237.

Before CUMMINGS and EASTERBROOK, Circuit Judges, and TIMBERS, Senior Circuit Judge.**

CUMMINGS, Circuit Judge.

A jury convicted David J. Shields, chief judge of the Chancery Division of the Circuit Court of Cook County, Illinois, of taking $5,000 or perhaps $6,000 from a lawyer named Pasquale F. DeLeo to fix a case. Shields was sentenced by Judge Rovner to thirty-seven months in prison plus three years of supervised release; DeLeo got a thirty-three-month sentence and two years of supervised release.[1] Shields' defense at trial, and the focus of his appeal to this Court, is that as a judge with twenty years' experience on the bench and an impeccable (until now) reputation, he simply made no deal and took no money. The whole enterprise, according to Shields, was a scam by DeLeo to extract money from another lawyer; Shields knew nothing about it. This other lawyer, it turned out, was a government informer.

We grant the validity of Shields' argument that the government's case lacks the kind of unassailable clarity one might wish to see in a prosecution of this sort: photographs of cash changing hands, tapes of co-conspirators talking about how they are going to spend the money, a parade of witnesses corroborating the illicit transaction. Nevertheless, the United States amassed a credible and coherent case against both defendants. Because we think the evidence was more than sufficient for a rational jury to conclude that Shields and DeLeo are guilty, and because their other legal arguments lack merit, we affirm their convictions.

The bribery investigation was originally targeted not at Shields but at another judge who was thought corrupt, or corruptible. Robert Cooley, a lawyer-turned-government-informer with longstanding involvement in Cook County graft and dishonesty, sought to fix a fictional case called *Nichols v. Wilson* in which Nichols claimed that his partner Wilson improperly took $350,000 in partnership funds. In his trial testimony, Cooley claimed to have bribed in his robust career at least twenty-nine Cook County judges as well as prosecutors, court clerks, police officers, corporation counsels, state's attorneys, a police chief and a mayor before deciding on his own initiative—no investigation against him was pending at the time—to assist the FBI as an informer in ensnaring corrupt Chicago officials. In this sting operation Cooley represented the non-existent Nichols whose partner had absconded with the funds. After the case was randomly assigned to Shields, Cooley tried unsuccessfully to have it moved onto the docket of another judge. On August 16, 1988, Cooley asked DeLeo, his former law partner, to help him transfer *Nichols v. Wilson*, but DeLeo told him a transfer was not necessary because Shields could be bribed

---

** The Honorable William H. Timbers, Senior Circuit Judge of the United States Court of Appeals for the Second Circuit, is sitting by designation.

1. Shields was charged with and convicted of seven counts in violation of the Hobbs Act, 18 U.S.C. § 1951, the Travel Act, 18 U.S.C. § 1952, and for making false statements to federal agents under 18 U.S.C. § 1001. DeLeo was charged with and convicted of five counts in violation of the Hobbs Act and the Travel Act. Shields and DeLeo received sentences of 37 months and 33 months respectively for each count, but the judge ruled that they should serve the time concurrently.

and that he, DeLeo, would do the bribing. This must have come as a surprise to Cooley because, according to his testimony, he thought Shields was honest and this view was confirmed by a well-known fixer, who told him he would not go near Shields "with a ten-foot pole" (joint supp. app. at D 28). As the defense points out repeatedly, Shields had a good reputation among Cook County judges; his only "indiscretion" was trying to talk his way out of a drunk-driving arrest by showing his judicial identification to the police. (In that instance he was cleared of judicial misconduct charges.) In any event, Cooley and DeLeo agreed to offer $2,500 to Shields to impose a temporary restraining order ("TRO") against make-believe-defendant Wilson to prohibit him from touching the contested partnership assets. This much neither DeLeo nor Shields disputes.

Shields, however, claims that DeLeo never meant to pass the money to the judge. The theory of his defense was that DeLeo knew upon hearing only a few sentences about *Nichols v. Wilson* that Cooley's client Nichols would win. Thus he made a quick calculation that he could assure Cooley of Shields' cooperation and pocket the money himself, secure in the knowledge that the judge would rule on his own initiative in Nichols' favor. With relatively minor exceptions, the rest of the facts in the case are not contested but take on opposite meanings depending on whether one believes the government or the defense. In the view of the prosecution, subsequent events, including favorable rulings by Shields, are evidence that the judge was bribed. In the view of the defense, subsequent events prove only that DeLeo was especially clever in scamming Cooley, his former law partner.

Those events include a phone call in Cooley's car on August 17, 1988, the day after DeLeo first broached the subject of bribing Shields. The case was going to court in two days and the conspirators (in reality, one conspirator and one FBI informer) did not know whether Shields would be on the bench. DeLeo dialed Shields' office on Cooley's car phone. Cooley could hear the secretary answer on the speakerphone, then DeLeo picked up the receiver and had a conversation, purportedly with Shields, during which the deceitful lawyer arranged a meeting with the judge. According to the defense, DeLeo was faking the conversation—no one, or at least not Shields, was on the other end of the line. But the defense does not explain why DeLeo would have taken such a risk when he plainly did not have to.

DeLeo also did not take the $2,500 supplied by the FBI that Cooley offered him in the car but waited until the morning of the TRO hearing. The prosecution contends that if DeLeo had been conning Cooley, he would have taken the money at the first opportunity. To the defense, his reluctance was the work of a genius swindler, proving to Cooley that he had no personal interest in the money. On the morning of the TRO hearing, August 19, 1988, DeLeo took the cash from Cooley in a bathroom on the twenty-fourth floor of the Richard J. Daley Center in Chicago, then walked off in the direction of Shields' chambers. He did not enter, according to the FBI agents who were watching. DeLeo later told Cooley that he had seen the judge but that Shields didn't want the money until the case was over. The government explains this non-event—the failure of DeLeo to hand Shields money—as normal caution since even a crooked judge cannot afford to make blatantly lopsided rulings; thus the payoff was delayed until it was clear a favorable judgment was possible. Money or no, Shields went to the bench that morning and granted the TRO Cooley wanted for his make-believe client.

DeLeo told Cooley later that he had managed to get the money to the judge. Cooley then said he wanted to convert the expiring TRO into a preliminary injunction and the two agreed to pay Shields another $2,500. DeLeo promised to talk to Shields before the next scheduled hearing—and he did. He waited for Shields in a City Hall corridor on August 30, 1988. The two shook hands and walked to the corner of Washington and LaSalle streets, where they stood talking for a couple of minutes longer. The judge returned to his courtroom, called the lawyers into chambers to discuss settlement, and when the attorneys could not agree granted

the preliminary injunction Cooley's client sought.

The defense claims that it was not unusual for DeLeo to have a conversation with Shields since the two had been casual acquaintances for ten years, and that they were not discussing *Nichols v. Wilson* but two other matters, including the reassignment of a divorce court judge who was a friend of DeLeo's, and the divorce of DeLeo's cousin, whom Shields knew slightly. After the August 30, 1988, hearing and settlement conference, DeLeo demonstrated knowledge in his discussions with Cooley that he could only have garnered by talking to the judge. For example, DeLeo knew that Shields would press the litigants to settle. It was quite reasonable, then, for the jury to conclude that Shields and DeLeo had discussed the case and, given the defense's theory, to deduce that they had schemed to resolve it in Cooley's client's favor.

Cooley gave DeLeo a second $2,500 on August 31, 1988, and DeLeo tried to see Shields that morning. The judge, however, was on the bench. Later DeLeo went to Shields' chambers carrying an accordion folder, inside of which was a large white envelope containing either the bribe (according to the prosecution) or pleadings in the divorce case of DeLeo's cousin (according to the defense). Since DeLeo had no reason to believe Cooley was following him, these attempts to see Shields (after he told Cooley he would) do not comport with the defense's contention that DeLeo was merely pulling a fast one against his former law partner. The actual conversation between Shields and DeLeo, recorded by the FBI, was elliptical but included the damning statement, apparently by DeLeo, that it was "nice to have an inside track" (Shields' supp. app. at C 1).

The next hearing was scheduled for September 2, 1988. In the meantime, the fictional defendant Wilson in *Nichols v. Wilson* filed an emergency motion seeking the release of a portion of the frozen partnership funds. Cooley told DeLeo on the morning of the September 2 hearing that if Wilson's request could be delayed, Wilson would be forced into settlement on unfavorable terms with Cooley's client, Nichols. DeLeo went straight to Shields' chambers where he spoke with the judge in private. This in itself was rare because Shields did not often close the door to his office. Again, the FBI recorded the conversation but not very effectively; the two sides bitterly disputed what was said. According to the government, the conversation went like this—

DeLeo: I'm going out of town next week. (inaudible) California (inaudible) stall [Wilson's motion] 'till next week and the case will be settled.

Shields: Alright.

The defense's version is as follows:

DeLeo: I am goin' outta town next week. (static) (inaudible) Be out there next week with (inaudible) California person. Wanted to come as far as next week is con- (inaudible).

Shields or DeLeo: Bye.

(Shields' supp. app. at D 1). DeLeo's report to Cooley about the conversation matched the government's interpretation. He told Cooley that he said to Shields, "We want to stall it till next week," and Cooley said, "Fine, that's all we need" (joint supp. app. at H 8). Whatever words were actually spoken between DeLeo and Shields, the judge did what DeLeo and Cooley wanted: he continued the case until the next week.

The case was dismissed by agreement of the fictional parties before any more hearings were held. Cooley later agreed to pay DeLeo $5,000 for his services. Cooley asked DeLeo if they should pay Shields more. Rather than answer affirmatively as might be expected were he keeping the money himself, DeLeo replied, "I don't think so." Cooley insisted on paying Shields another $1,000 in the event they should need his assistance again. Cooley spoke to DeLeo three more times and in each instance DeLeo said he had not yet delivered the additional money to the judge. FBI agents kept watch on the Daley Center until October 5, 1988, but DeLeo was not spotted. On October 3, 1988, two FBI agents questioned Judge Shields about *Nichols v. Wilson* in response to a (fictional) complaint by Wilson about how the case had been handled. Shields denied ever speaking about the matter with anyone except Cooley and an FBI agent, the lawyers in the fictitious case. The following June, six months after the FBI interview with Shields,

DeLeo and Cooley met each other by happenstance at a restaurant. The conversation was recorded because Cooley was involved in another undercover case, and DeLeo told Cooley with startling precision just what questions the FBI had asked Shields.

 The defense makes much of the fact that Shields' rulings in *Nichols v. Wilson* were legally correct. This misses two essential points. First and most obvious, issuing a judgment compelled or supported by law is no defense to taking a bribe. And since even parties with winning cases may benefit from fixing a case—by buying certainty of a favorable ruling—a legally correct decision conveys no useful information about the likelihood that the judge has been bribed. Second, several of Shields' rulings were clearly discretionary calls, such as granting a postponement to Nichols where delay meant Wilson was forced to settle on unfavorable terms. Every such discretionary ruling by Shields went in Cooley and DeLeo's favor. This undercuts the position of the defense that DeLeo could have known how Shields would rule on every aspect of *Nichols v. Wilson.*

 As we have often said before, the jury's verdict must be given credence unless the evidence, viewed in the light most favorable to the government, establishes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Saunders*, 973 F.2d 1354, 1359 (7th Cir.1992), certiorari denied, —— U.S. ——, 113 S.Ct. 1026, 122 L.Ed.2d 171. Consider some of the evidence before the jury here. There were two recordings with the incriminating statements, "[it's] nice to have an inside track" and (according to the government's interpretation) "stall it till next week," with the judge replying to the latter statement, "alright." Nothing about the divorce case Shields claims he discussed with DeLeo appears on any recording. DeLeo also met privately with Shields precisely when he told Cooley he would, and DeLeo knew critical details of *Nichols v. Wilson*—and about the judge's interview with the FBI—that he could have learned only from Shields. Then there was the envelope delivered by DeLeo to Shields. The defense was left to argue that DeLeo would have been foolish to hand Shields money in a conspicuous large white envelope, but why a large envelope should be any more or less suspicious than a small envelope is unclear. If DeLeo were as clever as Shields claims, he would have known that a larger envelope would be easier to explain—it could contain, for example, pleadings from a divorce case, as the defense suggested at trial. Perhaps most damaging to Shields' defense, however, was the sheer unlikelihood of the theory that DeLeo would scam Cooley, his former law partner. The story hinges on DeLeo knowing instantly that Cooley's client would prevail on every aspect of the case. It also requires one to believe that DeLeo was willing to risk losing all credibility with Cooley should Shields issue a ruling unfavorable to his client, hardly a smart strategy for someone with long-range interests in the graft business. And it fails to explain why DeLeo was so resistant to taking more money when Cooley was practically begging to give it to him. In short, a rational jury could (and did) convict Shields and DeLeo of fixing *Nichols v. Wilson.*

The defendants ask us to reverse their convictions on a slew of other grounds as well. Their joint brief claims that the indictment under which Shields and DeLeo were charged was faulty, that their convictions under the Hobbs Act, 18 U.S.C. § 1951, cannot stand because their actions did not affect commerce, and that the government improperly manufactured jurisdiction under the Travel Act, 18 U.S.C. § 1952.[2] We reject each argument.

---

2. 18 U.S.C. § 1951 (Hobbs Act) says in pertinent part:

 (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

 (b) As used in this section—* * *

 (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threat-

■ The defendants would have us dismiss the indictment, and thus their convictions, because while the government's authorization to wiretap Shields' chambers focused only on Hobbs Act violations, prosecutors presented the grand jury with evidence relating to two other statutes as well: the Travel Act and the false statement act, 18 U.S.C. § 1001. Under 18 U.S.C. § 2517(3), the government may disclose the contents of authorized intercepted communications in sworn testimony before a legal proceeding. But since the government had not obtained authorization to wiretap for Travel Act and false statement violations, Shields claims the government breached 18 U.S.C. § 2517(5), which bans unauthorized use of intercepted communications.

■ This argument fails on several grounds. First, the defendants raised this issue in the district court and the government corrected any problem by obtaining a judicial order approving the release of information about Travel Act and false statement charges. It then voided the first indictment and took the case before a second and uninfected grand jury, which promptly indicted the defendants for violations of the two statutes in addition to the Hobbs Act. Thus the indictments under which Shields and DeLeo were convicted were not tainted. Second, it would have been impossible for the government to obtain authorization to wiretap based on false statement allegations because Shields was not suspected of this crime until after the wiretapping began; the false statements were made by Shields to the FBI at the tail end of the case. Third, the Travel

Act and false statement charges were based on the same set of facts as the Hobbs Act violation. Since the government was free to release this information to a grand jury anyway under the Hobbs Act authorization, it is difficult to see how the defendants were harmed when the same facts were presented in the context of different offenses. It is true that empaneling a second grand jury will not cure an indictment based on unauthorized wiretapping. In this case, however, the government's indiscretion was not unauthorized wiretapping—or in the language of *United States v. Arnold,* 773 F.2d 823, 829 (7th Cir.1985), "subterfuge searches"—but the disclosure of what it learned. Defendants rely on *United States v. Brodson,* 528 F.2d 214 (7th Cir.1975). However, that case involved an indictment on different grounds entirely than the original authorization rather than, as here, additional grounds, and in *Brodson* the government waited to seek court authorization until eight months after it presented the information to a grand jury. *Id.* at 215. In *Arnold,* we held that belated approval would cure a defective original authorization if the original order was lawfully obtained, sought in good faith, and the questionable communication was incidentally intercepted during the course of a lawfully executed order. 773 F.2d at 829 (quoting S.Rep. No. 1097, 90th Cong., 2d Sess. 66, *reprinted in* 1968 U.S.Code Cong. & Ad. News, 2112, 2189). Each condition was met in this case.

■ The defendants next argue jointly, and DeLeo also argues in his individual brief,

---

ened force, violence, or fear, or under color of official right.

(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State, and all other commerce over which the United States has jurisdiction. 18 U.S.C. § 1952 (Travel Act) says in pertinent part:

(a) Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means * * * (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

that their Hobbs Act convictions must be wiped away because all the money Cooley paid to Shields via DeLeo was provided by the FBI. To constitute an offense under the Hobbs Act, a deed must have an effect on interstate commerce. However, we have explicitly rejected the argument made by defendants here that where the FBI fronts the money in an extortion scheme, there is no influence on interstate commerce. *United States v. Hocking,* 860 F.2d 769, 777 (7th Cir.1988), partially overruled on other grounds, *United States v. Levy,* 955 F.2d 1098, 1103–1104 n. 5 (7th Cir.1992). That is because the Hobbs Act proscribes not just successful extortion schemes but "*attempts* to induce a victim engaged in interstate commerce to part with property." *United States v. Rindone,* 631 F.2d 491, 493 (7th Cir.1980) (emphasis added). Thus one may be convicted of violating the Hobbs Act even though no money has changed hands. The government need only prove that there is a "realistic probability" of an effect on commerce. *United States v. Anderson,* 809 F.2d 1281, 1286 (7th Cir.1987). Since the Supreme Court has interpreted the Hobbs Act to reach the limits of the Commerce Clause, *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252, the burden on the government is slight or *de minimis. Anderson,* 809 F.2d at 1286. In this case, the theory of the United States was that Shields' acceptance of bribes would have "depleted the assets" of Cooley's law firm, which regularly purchased items from states other than Illinois. See *United States v. Murphy,* 768 F.2d 1518, 1530 (7th Cir.1985), certiorari denied, 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304. Defendants argue that Cooley was a wealthy man who might lose hundreds of thousands each week gambling, but this is beside the point; one's assets are no less depleted by an extortion scheme merely because one has a lot of assets. It is true that Cooley's money was never at risk because the FBI was supplying the bribes, but as noted we rejected the same argument in *Hocking,* 860 F.2d at 777, a case not discussed by the defense. The cases cited by Shields and DeLeo, such as *United States v. DiCarlantonio,* 870 F.2d 1058 (6th Cir.1989), certiorari denied, 493 U.S. 933, 110 S.Ct. 323, 107 L.Ed.2d 313 deal with substantive Hobbs Act violations rather than attempts and are inapplicable.

■ The last argument mounted jointly by the defendants alleges that the government improperly manufactured Travel Act jurisdiction. Before the August 30, 1988 hearing, Cooley attempted to postpone matters by saying that his client, Nichols, was in Seattle. DeLeo insisted that Cooley convince his client to return to Chicago for the hearing. This required that the undercover FBI agent who was pretending to be Nichols travel to Chicago from his home in Phoenix. The defendants rely on *United States v. Archer,* 486 F.2d 670 (2d Cir.1973), for the proposition that the government may not concoct jurisdiction by, for example, inducing a suspect to telephone a federal agent out of state where establishing a Travel Act violation is the only purpose of the call. But we seriously doubted the vitality of *Archer* in this (and other) circuit(s) in *United States v. Podolsky,* 798 F.2d 177, 181 (1986), in situations (like the instant case) where circumstances do not suggest entrapment and the supposed manufacture of jurisdiction does not cancel an element of the offense. We recently left open the possibility of an *Archer*-like claim in *United States v. Peters,* 952 F.2d 960, 963 (1992), certiorari denied, —— U.S. ——, 112 S.Ct. 1277, 117 L.Ed.2d 503. However, in *Peters* we upheld a Travel Act conviction where a defendant merely drove a stolen truck to a drop-off point ten miles over the Indiana state line at the direction of FBI agents. Nothing about the fencing operation in *Peters* required that the stolen cars cross state lines except that the FBI's undercover agent was based there. In the instant case, the FBI agent was also based out of state; his participation was necessary because he had been involved in similar operations and because it was important to use an agent who would not be recognized in Chicago legal circles. Moreover, defendant DeLeo insisted to Cooley that Nichols return from his trip to attend the August 30 hearing. Thus unlike *Peters* where the FBI agents themselves orchestrated jurisdiction by instructing the defendant to cross the border, here it was DeLeo, without encouragement by FBI infor-

mants, who insisted that Cooley's client cross state lines.

■ Having rejected the arguments made jointly, we return to the contentions of the individual defendants. Shields, in addition to the sufficiency argument considered above, makes two claims worth discussing. The first is that Judge Rovner erred when she allowed the government to introduce the testimony of convicted Greylord Judge Frank Salerno, who claimed to have accepted bribes from defendant DeLeo on a number of occasions. In the alternative, Shields argues that the district court should have given a limiting jury instruction or granted a severance based on the unfair prejudice of Salerno's testimony.

DeLeo began the trial with his counsel refusing to specify what his defense might be. Adopting Shields' version of events was problematic because convincing another person to give you money so that you can bribe a judge is illegal even if you intend to keep the money yourself. Yet DeLeo had few other defenses available to him; he could not and did not claim not to have taken money from Cooley, and entrapment was never at issue. The court initially excluded the Salerno testimony in an *in limine* ruling by noting that DeLeo had not put his intent in issue, but Judge Rovner warned DeLeo's counsel that if he mounted a "rainmaking" defense—i.e., if he claimed that he had conned Cooley and never tried to bribe Shields—she would reconsider her exclusion of the Salerno testimony. The colloquy about just what De-Leo's defense was continued throughout the trial until finally DeLeo submitted a jury instruction suggesting a rainmaking defense. True to her word, Judge Rovner then decided to allow Salerno to testify.

■ The test for admitting past act evidence under Federal Rule of Evidence 404(b) is whether:

(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to

support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*United States v. Zapata,* 871 F.2d 616, 620 (7th Cir.1989). Shields admits that the Salerno testimony was relevant, but argues that its admission violates the other three prongs of Rule 404(b). We disagree. Shields' contention that DeLeo's intent was not at issue, only his conduct, flies in the face of our decision in *United States v. Tuchow,* 768 F.2d 855, 864 (1985). There the defendant in a bribery case also claimed to have kept the money himself. Such a rainmaking defense, we found, implicates intent because the defendant attempts to attach an innocent explanation to otherwise inculpatory behavior. In this case both defendants asked the jury to believe that DeLeo's actions toward Shields—handing the judge an envelope, talking to the judge behind closed doors, etc.—were innocent. DeLeo's intent either to bribe Shields or merely con Cooley was the central question of the case.

Shields next argues under Rule 404(b) that DeLeo's bribes to Salerno were not sufficiently similar to his bribes to Shields to justify letting the jury hear about the earlier acts. The critical distinction, according to Shields, is that DeLeo bribed Salerno in his own cases instead of acting as a middleman, as he was charged with doing here. Yet DeLeo also acted as a middleman in his bribes to Salerno—the only and insignificant difference is that DeLeo bribed Salerno on his own client's behalf while he bribed Shields on Cooley's clients' behalf. The information about DeLeo's behavior years earlier was relevant because it demonstrated he had the ability, willingness and chutzpah to bribe a judge.

■ Shields' last argument about the Salerno testimony is that the prejudicial effect outweighed the probative value. We accord a district court's determination of this question "special deference." *United States v. York,* 933 F.2d 1343, 1348 (7th Cir.1991), certiorari denied, —— U.S. ——, 112 S.Ct. 651, 116 L.Ed.2d 668. Judge Rovner's decision that the Salerno testimony was not over-

ly prejudicial to Shields was correct for two reasons. First, the testimony was highly relevant because, as noted, Shields' own defense turned on DeLeo's intent. Second, Shields' claim that he was inordinately prejudiced by what Salerno said is not credible. Rule 404(b) is designed to prevent the admission of propensity evidence. Here the Salerno bribes reflected on the characters of Salerno and DeLeo, but they conveyed nothing at all about Shields unless the jury concluded in a kind of throw-the-bums-out judgment that all Cook County judges were on the take. Salerno's testimony probably helped Shields as much as it harmed him because the Greylord judge also testified that, so far as he knew, Shields was honest. Shields' counsel even argued in closing that if Shields were corrupt, Salerno would have known about it. Because Shields was not significantly prejudiced by the Salerno testimony, Judge Rovner was correct in denying his motion for severance. As for her denial of a special jury instruction, the judge told jurors repeatedly and gave jurors an instruction to the effect that Salerno's testimony was relevant only to the issue of DeLeo's intent; that was sufficient.

■ In his individual brief, DeLeo makes the same argument about the Salerno testimony as does Shields, but with a twist. According to DeLeo, prosecutors "sandbagg[ed]" him by not objecting when he offered the rainmaking jury instruction which put his intent in issue and which triggered Judge Rovner's decision to admit the Salerno testimony. The government exacerbated the treachery, in DeLeo's view, by arguing in closing that the rainmaking defense, even if believed, would not excuse DeLeo from liability. DeLeo offers no case authority for the dubious proposition that prosecutors were obliged to object to DeLeo's counsel shooting his client in the foot by putting intent in issue. Judge Rovner warned DeLeo in the earliest stages of the trial that she would admit Salerno's testimony if DeLeo opened the door to intent by asserting a rainmaking defense. It is also rather incredible for DeLeo now to claim his trial counsel was unaware that taking money under the pretense of bribing a judge is against the law. One would be hard-pressed to imagine a more elementary judgment an attorney would have to make about his client's case.

■ Shields' final argument meriting discussion concerns the testimony of FBI informer Cooley and the district court's decision to allow the prosecution to explore his lengthy involvement in Cook County graft on direct examination. According to Shields, the government's questioning of Cooley was a guise for putting improper testimony before the jury. Yet the state may impeach its own witness to lessen the blow of cross-examination; this is the most basic trial strategy. *United States v. LeFevour,* 798 F.2d 977, 983 (7th Cir.1986). It is true that impeachment of one's own witness is not permissible if the questioning is a means of subterfuge to expose the jury to otherwise inadmissible evidence. *United States v. Webster,* 734 F.2d 1191, 1192 (7th Cir.1984). But in this instance there is little doubt that Cooley's roguish past would have come out on cross-examination; as early as opening statements, Shields' attorney called Cooley an "evil, corrupt lawyer." Thus the government had a legitimate reason to explore the subject on direct examination.

■ Finally, DeLeo in his individual brief claims that he should have been granted a severance because Shields' trial strategy was to dump the blame on him. The failure of logic in this argument is that Shields' defense could not have been antagonistic to DeLeo's defense as is required under *United States v. Walters,* 913 F.2d 388, 392 (7th Cir.1990), since the two defenses were identical.

We reject all other arguments made by defendants, and for the reasons stated above the convictions of Shields and DeLeo are affirmed.