**UNITED STATES of America,
Appellant,**

v.

**Frank GIAMPA.**

No. 84–5445.

United States Court of Appeals,
Third Circuit.

Argued Feb. 11, 1985.
Decided March 29, 1985.

Ralph A. Jacobs, Chief, Appeals Div., Asst. U.S. Atty. (argued), W. Hunt Dumont, U.S. Atty., Newark, N.J., for appellant.

Michael Gross (argued), Gross & Gross, River Edge, N.J., for appellee.

Before GARTH, BECKER and RO-SENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This unusual appeal by the Government from a judgment of acquittal entered by the United States District Court for the District of New Jersey depends largely upon an analysis of the trial judge's comments during trial and the characterization of his order at the close of the case. During the trial, the judge made several unfavorable comments about the prosecution's case, and at the conclusion of the evidence, announced he was dismissing the indictment because the Government failed to disclose certain arguably helpful materials to the defense in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Eight days later, however, the court entered a judgment of acquittal on the ground that the Government submitted insufficient evidence to sustain a conviction.

The Government contends on appeal that although nominally entered as a judgment of acquittal, the substance of the district court's order constituted a dismissal of the indictment for a *Brady* violation, and that the Government committed no *Brady* violation. We reject the Government's contention and dismiss the appeal.

### I.

In the fall of 1982, Joseph Ciambrone, a convicted felon, informed the FBI that Frank Giampa had loaned him $70,000, was charging him exorbitant interest, and had threatened him with retaliation from organized crime families if the money were not repaid. The FBI agent advised Ciambrone to tape record all further conversations with Giampa. Ultimately, Ciambrone was placed in the Federal Witness Protection Program and offered immunity from prosecution for all felonies committed during 1981 and 1982 in exchange for pleading guilty to a mail fraud scheme and for cooperation in various investigations, including the investigation of Giampa. Ciambrone had a prior criminal record of at least seven convictions, mostly for larceny.

A grand jury subsequently indicted Giampa on one count of making an extortionate extension of credit in violation of 18 U.S.C. § 892, one count of threatening violence in connection with a loan in violation of 18 U.S.C. § 1951, and two counts of using extortionate means to collect an extension of credit in violation of 18 U.S.C. § 894. The first three counts referred to loans allegedly made to Ciambrone, and the fourth referred to a loan Giampa allegedly made to Andrew Thorry, Ciambrone's nephew by marriage. Immediately after the indictment, the Government provided counsel for the defendant with a list of names, stating that the list comprised exculpatory material the Government was required to disclose to defendant pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Ciambrone was the prosecution's chief witness at trial. He testified that he bought a trucking company from Giampa in 1981 and that Giampa had told him the payments would go to "a family from New York" or "people from Long Island" and that there would be "trouble" if they were not made on time. Ciambrone said he assumed that the term "families from New York" meant "crime families." Ciambrone also testified that Giampa loaned Andrew Thorry $5000 with interest of five percent a week, that Giampa had threatened violence if the loan were not repaid and that he, Ciambrone, had offered to repay the money for Thorry.

Finally, Ciambrone testified that he and Giampa were involved in various trucking deals together, for which Giampa provided capital, and charged exorbitant interest. Again, he said Giampa threatened violence by "Tommy" and "some people from Long Island" if the loans were not repaid. Tape recordings made by Ciambrone of three telephone conversations between Giampa and Ciambrone were played at trial. The tapes contained references to high interest loans and threats of violence by "Tommy" and "two different families." One of the

tapes, however, was found to have an unexplained gap, where the tape had been erased or the recording machine malfunctioned.

On cross-examination, counsel for the defendant suggested that Ciambrone knew that the source of the money was not organized crime, but rather four of Giampa's friends: Michael Kowalski, Peter Enrico, Nancy Onello, and Richard Pometti. Ciambrone denied knowing Pometti and Kowalski and stated that he knew Onello but had never taken any money from her.

The Government's only other witness in chief was Ciambrone's niece, Merrie Thorry. She testified that she had been married to Andrew Thorry and during her marriage her husband had received about ten phone calls from someone identifying himself as Frank Giampa. In one of those conversations, she said, Giampa told her that her husband owed him money, and that since Andrew hadn't gotten in touch with him "it was more or less out of his hands" and warned her that "they" might send two guys to sit in front of her house and wait for her husband. Merrie Thorry testified that she was frightened by Giampa's threats.

The defense then presented its case, starting with the testimony of Giampa. Giampa testified that he was twenty-six years old, that he had never been convicted of a crime, and that he had once held the title of Mr. New Jersey. He met Ciambrone in 1981 when Ciambrone bought Container Transit, a company, from Giampa and his partners. According to Giampa, he and Ciambrone developed a "very close friendship." Giampa said he "idolized" Ciambrone, "wanted to be like him ... wanted to have what he had." Ciambrone promised Giampa he would get him a white Rolls Royce and have beautiful furniture delivered to his house. Giampa said Ciambrone bragged that he was the second best truck parts salesman in the United States and that his yard was worth a million dollars.

Eventually, Ciambrone suggested to Giampa that the two go into business to-

gether, and the two became involved in a series of transactions each involving investments by Giampa of $5000 or $10,000. Giampa also described a separate business arrangement among himself, Ciambrone, and Giampa's friend Michael Kowalski, who was suffering from a terminal illness. According to Giampa, Kowalski had been interested for some time in starting an amusement arcade, but had been unable to do so. Ciambrone promised he would open such an arcade in Hoboken, and accept Kowalski and Giampa as partners. Giampa testified that Kowalski personally gave Ciambrone a check for about $30,000, and Ciambrone never returned this money to Kowalski.

According to Giampa, Nancy Onello was involved in a third transaction with Ciambrone. Giampa testified that in his presence Ciambrone told Onello that the three of them would make a lot of money in a trucking company founded by Ciambrone. Giampa said he saw Onello give Ciambrone $18,000.

Giampa also testified that he convinced his friend Peter Enrico to invest $15,000 in a restaurant Ciambrone planned to open and that Ciambrone referred to Enrico as "the guy who would run the restaurant." Finally, Giampa said he was present at a meeting at which Ciambrone promised Richard Pometti a job in a cold storage warehouse in Bayonne if Pometti would invest $12,000 in the warehouse. Giampa testified that he guaranteed the $12,000 and that Ciambrone never returned any of the money to Pometti.

Giampa further testified that between July and October 1982, he became increasingly concerned about getting his money back. He asked to borrow one of the trucks Ciambrone said he had purchased for their business, and the truck never appeared. He heard rumors that Ciambrone was going to jail. By September, he was expressing his concern to Ciambrone who told him not to worry, that all the money would be paid back.

Giampa said he then tried to frighten Ciambrone by saying "If I can't get [the

money] back from you, I'll get somebody else to do it." but that Ciambrone answered, "Come on, Frank. I know where the money came from. All your friends." Giampa admitted trying to scare Ciambrone during the three taped telephone conversations, but insisted that he did not believe Ciambrone was at all frightened. He also testified that he had never lent Andrew Thorry any money and that he had never threatened Merrie Thorry. On cross-examination, he explained that he didn't know anyone from organized crime, and that as far as he knew, there was no such person as "Tommy" from Long Island.

Andrew Thorry testified that he had never borrowed money from Giampa, and that he had so informed the Government and the grand jury. He also testified that Giampa had never threatened him and that to his knowledge his wife had never been threatened. Nancy Onello and Michael Kowalski then took the stand, and their stories confirmed Giampa's.

Richard Pometti was then called to the stand and his testimony substantially corroborated Giampa. Pometti also said that he told the grand jury that he provided funds to Giampa and Ciambrone for *investment* purposes. At the close of Pometti's testimony, the court instructed the prosecutor to turn Pometti's grand jury testimony over to defense counsel under *Brady,* along with the grand jury testimony of Onello, Peter Enrico, and Andrew Thorry.

After the testimony of several character witnesses for the defense, the court ordered that Ciambrone be recalled to the stand. Ciambrone denied ever doing business with Richard Pometti, denied knowing Nancy Onello, Michael Kowalski, or Peter Enrico, and repeated that to the best of his knowledge and belief the money came from organized crime figures on Long Island. Kowalski, Pometti, and Onello were then recalled to the stand and identified Ciambrone as the man to whom they personally gave money to *invest* in various enterprises.

FBI agent Stephen Foster testified, and he was corroborated by FBI agent Yach-

metz, that he investigated records of Onello's and Pometti's financial transactions, that these records were subpoenaed by the grand jury, and that they provided support for Giampa's testimony. Foster also testified that none of these records were ever disclosed to the defense. Finally, defense counsel produced financial records of Michael Kowalski which fully corroborated Giampa's testimony. At that point, the court asked the prosecutor, "Do you want to continue this prosecution?" and the prosecutor replied that he did.

After further discussion with counsel, the court stated, "I find that I believe there to be a *Brady* violation here, at a minimum. Let's put it that way. At a minimum, bare minimum." Later, the court commented,

> There is an unsavory taste here. I am not in the unsavory taste business. I'm in the clean and pure business. I commend to your attention Mr. Ciambrone. It seems to me that if Mr. Ciambrone has lied, that he should be prosecuted for it.

Counsel for the prosecution argued that what was at issue was basically Ciambrone's credibility. The court agreed, saying:

> Actually, you are quite right, you know. As you say—the old song used to be: "It's Not For Me to Say." I don't get to make those decisions as to whether Ciambrone is telling the truth or the other people is telling the truth. That is not for a judge to determine.
>
> But it is for a judge to determine whether the trial has been prosecuted fairly, whether information has been given over to the defense which should have been given over in the pretrial stage.

The court concluded:

> Because I find there has been a *Brady* violation, because I find that the defendant has been prejudiced, because I cannot psychoanalyze the jury, because I cannot know what could have been done on the cross-examination of Mr. Ciambrone earlier if the documents and exhibits were available earlier, because to me the violation is a clear one, I'm going to

enter dismissal of this case. The defendant is free.

Eight days later the court entered a judgment of acquittal on the ground of insufficient evidence. The Government filed a timely notice of appeal.

## II.

"Perhaps the most fundamental rule in the history of double jeopardy jurisprudence has been that '[a] verdict of acquittal ... could not be reviewed, error or otherwise, without putting [a defendant] twice in jeopardy, and thereby violating the Constitution." *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571, 97 S.Ct. 1349, 1354, 51 L.Ed.2d 642 (1977) (quoting *United States v. Ball*, 163 U.S. 662, 671, 16 S.Ct. 1192, 1195, 41 L.Ed. 300 (1896)).

The Government argues in the instant case that the district court order in substance constituted not a judgment of acquittal, but a dismissal of the indictment as a remedy for a *Brady* violation. Therefore, according to the Government, the court order does not raise a double jeopardy bar to retrial. The Government asserts that various statements by the court indicate that it did not make a determination of the sufficiency of the evidence, but simply dismissed the case based on its conclusion that the defense was prejudiced by the prosecution's failure to disclose the grand jury testimony and financial records of Onello, Enrico, Pometti, and Kowalski. The formal written order acquitting the defendant, the Government urges, was simply erroneous and should not control. *See Martin Linen*, 430 U.S. at 571, 97 S.Ct. at 1354; *United States v. Wilson*, 420 U.S. 332, 336, 95 S.Ct. 1013, 1018, 43 L.Ed.2d 232 (1975) (what constitutes an "acquittal" not controlled by the form of the judge's action); *United States v. Sisson*, 399 U.S. 267, 270, 90 S.Ct. 2117, 2119, 26 L.Ed.2d 608 (1970). *But see Sanabria v. United States*, 437 U.S. 54, 66, 98 S.Ct. 2170, 2179 (1978) ("While form is not to be exalted over substance in determining the double jeopardy consequences of a ruling terminating a prosecution, neither is it appropriate entirely to ignore the form of order entered by the trial court." (citations omitted)).

In *Fong Foo v. United States*, 369 U.S. 141, 143, 82 S.Ct. 671, 672, 7 L.Ed.2d 629 (1962), the Supreme Court held that a " 'verdict of acquittal was final, and could not be reviewed ... without putting [the petitioners] twice in jeopardy, and thereby violating the Constitution' " even though "the Court of Appeals thought, not without reason, that the acquittal was based upon an egregiously erroneous foundation." In *Fong Foo*, the district court entered a judgment of acquittal based on alleged prosecutorial misconduct and on the supposed lack of credibility of the witnesses for the prosecution.

The *Fong Foo* principle was reaffirmed by the Court fourteen years later in *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 97 S.Ct. 1349. In *Martin Linen*, successful motions for judgment of acquittal were made after a "hopelessly deadlocked" jury was dismissed. The Court found that the judgments of acquittal were "acquittals" in substance as well as form. The trial judge made clear his belief that the prosecution had "the weakest [contempt case that he had] ever seen." In entering the judgments of acquittal, the judge also recorded his view that "the government has failed to prove the material allegations beyond a reasonable doubt" and that "defendant should be found not guilty." *Martin Linen*, 430 U.S. at 572, 97 S.Ct. at 1355. The Supreme Court warned that "we have emphasized that what constitutes an 'acquittal' is not to be controlled by the form of the judge's action.... Rather we must determine whether the ruling of the judge, whatever its label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged." *Id.* at 571, 97 S.Ct. at 1355 [citations omitted].

The "factual elements" test was applied by the Court in *United States v. Scott*, 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978), in which the defendant successfully moved during the trial for a dismissal due to pre-

indictment delay. The Court relied on the "factual elements test" and added that "appeal will be barred only when 'it is plain that the District Court ... evaluated the Government's evidence and determined that it was legally 'sufficient to sustain a conviction.'" *Scott*, 437 U.S. at 97, 98 S.Ct. at 2197 (quoting *Martin Linen*, 430 U.S. at 572, 97 S.Ct. at 1355). *See also United States v. Maker*, 751 F.2d 614, 622 (3d Cir.1984) (factual elements test "provides the crucial definition for determining whether double jeopardy bars an appeal when a proceeding is terminated on the motion of a defendant after the jury is sworn.")

The relevant question in the instant case, under the *Martin Linen* line of cases, is whether the district court resolved in favor of Giampa some or all of the factual elements of the offenses of which Giampa was charged. In the instant case, we note that much of the difficulty that confronts us must be attributed to a murky and obscure record. At one stage in the trial, the trial judge expounded on the Government's failure to provide the defense with exculpatory material pursuant to *Brady*. At another, he appeared to pass upon the credibility of both the Government and the defense witnesses, a role that he himself recognized was the exclusive province of the jury. Without a statement of reasons from the judge, it is impossible to tell from the record whether the judgment of acquittal was an independent afterthought or whether it was in lieu of or conjoined with the *Brady* dismissal. Furthermore, the defendant did not move for a judgment of acquittal after the Government's case, although prodded by the judge to do so. On the other hand, the Government failed to move for a clarification of the judge's ruling after he entered judgment, thereby missing an opportunity to test the basis of the court's order.

Applying the factual elements test to the crimes charged in the instant case, we note that the elements of a violation of 18 U.S.C. § 892 (making an extortionate extension of credit) include an "understanding of the creditor and the debtor at the time [the extension of credit] is made that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm...." 18 U.S.C. § 891(6) (1982).

The comments of the trial judge suggest that he concluded that Ciambrone knew that the source of the funding was Giampa's friends, and that there was no understanding between Ciambrone and Giampa that delay could result in the use of violence. Similarly, the testimony of Giampa and his friends could have led the trial judge reasonably to conclude that the funds had been provided Ciambrone for *investment purposes* rather than as loans. A violation of 18 U.S.C. § 894 requires both an "extension of credit" and the use of "extortionate means." 18 U.S.C. § 894 (1982). Again, the judge's comments indicate that Giampa did not intend to *lend* money to Ciambrone and that Ciambrone had no reason to believe that harm would come to him if he failed to provide Giampa and his friends with returns on their various "investments." 18 U.S.C. § 1951 also involves the threat of violence, and insufficient evidence that Ciambrone was put in fear would preclude a conviction on this count. 18 U.S.C. § 1951 (1982). *See United States v. Stirone*, 311 F.2d 277, 280 (3d Cir.1962) (quoting *Nick v. United States*, 122 F.2d 660, 671 (8th Cir.) ("Extortion involves a state of mind as an element of an offense under [18 U.S.C. § 1951]. Unless there is some form of compulsion (either physical or fear), there is no crime...."), *cert. denied*, 314 U.S. 687, 62 S.Ct. 302, 86 L.Ed. 550 (1941)).

At several points during the trial, the court expressed severe reservations about the credibility of Ciambrone's testimony and about the sufficiency of the prosecution's case. For example, the court was obviously favorably impressed with Kowalski's credibility.

THE COURT: Do you think it is relevant whether this man is presently dying to whether he's lying or not?

MR. ROBINS [Gov't Counsel]: No, I don't, Judge.

THE COURT: You don't?

MR. ROBINS: No.

THE COURT: I do. Look, I'm a tough judge. But enough is enough. Something is weird in this case.

Later, the court commented, "Something is very strange here."

At the same time, the court issued repeated warnings to the prosecution about the consequences for the prosecution's case of any possible perjury by Ciambrone.

THE COURT: I think this: That if Mr. Ciambrone is lying in this courtroom, you and your agent here ought to arrest him because that would be a violation of law as much as the violation of law which you have brought into this court. But, in my view, a greater violation of law, a more serious violation of law ... [T]his testimony goes to the very heart of this case doesn't it?

Throughout the trial, the court also expressed considerable skepticism about the strength of the prosecution's case:

THE COURT: You are—your superiors in Washington, are they still the Organized Crime and Racketeering Section?

MR. ROBINS: I believe that's their title, Judge.

THE COURT: ... I gather you are usually not in the business of prosecuting people who simply—who are desperate to get their money back and say, "I'll have somebody from organized crime beat you up;" right?

MR. ROBINS: That's right, Judge. That is not what we presented in this case.

After defense counsel produced Kowalski's financial records, the court asked, "Mr. Robins ... [d]o you want to continue this prosecution?"

During the very last colloquy between the court and counsel, the court remarked, "I'm amazed that the government should have brought this case into court on this theory." Although the judge's comments about the theory of the Government's case and the credibility of the witnesses were impermissible, nevertheless, the judgment of acquittal entered eight days after the trial ended specifically stated that the court was "of the opinion that the evidence submitted by the United States of America is insufficient to sustain a conviction of the offense charged in the indictment."

Despite his statements about dismissal on *Brady* grounds, the court ultimately chose to acquit for insufficiency of the evidence. In the instant case, as in *Martin Linen*, it appears "that the District Court ... evaluated the Government's evidence and determined that it was legally insufficient to sustain a conviction," and that the judge's ruling "represents a resolution ... of the factual elements of the offense charged." *Martin Linen*, 430 U.S. at 571, 572, 97 S.Ct. at 1354, 1355; *see also United States v. Ember*, 726 F.2d 522, 524 & n. 4 (9th Cir.1984).

 While the district court's resolution of the case, i.e., its entry of a judgment of acquittal by reason of insufficiency of evidence, thus comes within the rubric of the double jeopardy clause, and is accordingly precluded from our review, this is not to say that we agree with the manner by which the district court arrived at the entry of such a judgment. We note that a judgment of acquittal should be entered only upon consideration of the sufficiency of the *Government's* evidence. *See United States v. Martin Linen*, 430 U.S. at 572, 97 S.Ct. at 1355; *United States v. Horton*, 180 F.2d 427 (7th Cir.1950). That is, the district court must determine whether the Government has adduced sufficient evidence respecting each element of the offense charged to permit jury consideration. The district court cannot and should not weigh the evidence. 3 Wharton's Criminal Procedure § 520 at 434–36 (12th ed. 1975). *See Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982) (distinguishing weight of evidence determination from sufficiency of evidence determination; only sufficiency of evidence determination raises double jeopardy bar to retrial after guilty verdict). Nor, as we stat-

ed, is the district court permitted to make credibility determinations. The district court is confined solely to its assessment of the sufficiency of the Government's evidence.

Here, the district court, rather than reserving, denied a motion for judgment of acquittal made at the close of the Government's case, thus giving expression to the district court's view that the Government's evidence was in fact sufficient *at that time* to sustain a guilty verdict. Later, at the end of all the evidence, the district court entered a judgment of acquittal.

As we have observed above, the district court may not make credibility determinations when it rules on a motion for judgment of acquittal. *United States v. Cravero,* 530 F.2d 666 (5th Cir.1976); *United States v. Weinstein,* 452 F.2d 704, 713 (2d Cir.1971), *cert. denied sub nom Grunberger v. United States,* 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972); 3 Wharton's Criminal Procedure § 520 at 436 (12th ed. 1975). As the district court itself noted during the trial, "I don't get to make those decisions as to whether Ciambrone is telling the truth or the other people is telling the truth. That is not for a judge to decide." Yet, as our reading of the record reveals, the district court's entry of judgment of acquittal appears to have been premised largely on its disbelief of Ciambrone's testimony in favor of Giampa's and Kowalski's. As we have stated, such a determination is for the jury.

As stated by the Fifth Circuit in *United States v. Cravero,* 530 F.2d 666, 670 (5th Cir.1976):

One of the oldest established rules of Anglo-American jurisprudence is that the jury is the arbiter of credibility of witnesses. As the Supreme Court stated in *Hoffa v. United States,* 385 U.S. 293, 311, 87 S.Ct. 408, 418, 17 L.Ed.2d 374, 387 (1966).

The established safeguards of an Anglo-American legal system leave the veracity of a witness to be detected by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury.

The trial judge cannot arrogate to himself this power of the jury simply because he finds a witness unbelievable. *See United States v. Weinstein, supra,* at 713. Under our system of jurisprudence a properly instructed jury of citizens decides whether witnesses are credible. The trial judge is deemed to have no special expertise in determining who speaks the truth.

(footnote and citations omitted).

■ Thus, our dismissal of this appeal is not to be regarded as an endorsement of the manner in which the district court arrived at its ruling which acquitted Giampa. As we have discussed, even an incorrect or improper factual resolution of the elements of the charged offense cannot be reviewed by us when the district court thereafter enters a judgment of acquittal. *Fong Foo v. United States, supra.* As a consequence, our discussion here has been undertaken only for the purpose of defining the proper scope of the district court's inquiry when it determines whether to enter a judgment of acquittal.

■ Moreover, although we recognize that trial courts operate under severe pressures, we nevertheless must emphasize that trial judges must explain critical rulings adequately, with support from the record, to afford a basis for appellate review. This was not the case with the district court's order granting Giampa a judgment of acquittal. However, because we conclude that the district court resolved some or all of the factual elements of the offense charged, we hold that this court is barred by the Double Jeopardy Clause of the Constitution from reviewing the judg-

ment of acquittal entered by the district court. It is therefore unnecessary for us to reach the issues surrounding the alleged *Brady* violation.[1]

### III.

We conclude that appellate review of the judgment of the district court is barred by the Double Jeopardy Clause. The appeal will be dismissed.

---

**1.** The Government contends that the district court lacked jurisdiction to enter a judgment of acquittal because it entered the order more than seven days after discharge of the jury. Fed.R. Crim.P. 29(c). Rule 29(c), however, "creates a deadline by which defendants must present motions for acquittal to the court; it does not address the court's inherent power to grant such

a judgment." *State of Arizona v. Manypenny,* 672 F.2d 761, 764 (9th Cir.), *rev'd. on other grounds,* 451 U.S. 232, 101 S.Ct. 1657, 68 L.Ed.2d 58 (1981). The Court in this instance acted *sua sponte* under its inherent power. *But see United States v. Godoy,* 678 F.2d 84, 88 (9th Cir.1982) (dicta), *cert. denied,* — U.S. —, 104 S.Ct. 390, 78 L.Ed.2d 334 (1983).