UNITED STATES of America,
Plaintiff–Appellee,

v.

Mark Allen KNOX and Armando Herman Carreiro, Defendants–Appellants.

Nos. 94–2449, 94–2489.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 5, 1995.

Decided Oct. 10, 1995.

Rehearing Denied Dec. 8, 1995.

Brian P. Netols (argued), Office of the United States Attorney, Criminal Division, Chicago, IL, Barry Rand Elden, Asst. U.S. Atty., Criminal Appellate Division, Chicago, IL, for the U.S.

Edward X. Clinton (argued), Mayer, Brown & Platt, Chicago, IL, for Mark A. Knox.

Thomas A. Durkin, Michigan City, IN, Leonard C. Goodman (argued), Chicago, IL, for Armando Peter Carreiro.

Before RIPPLE and ROVNER, Circuit Judges, and MILLER, District Judge.*

MILLER, District Judge.

Armando Carreiro and Mark Knox were convicted by a jury of conspiracy to engage in extortion, 18 U.S.C. § 371, attempted extortion, 18 U.S.C. § 1951, and conspiracy to commit bankruptcy fraud, 18 U.S.C. § 371. Mr. Carreiro also was convicted of interstate travel to facilitate extortion. 18 U.S.C. § 1952. Mr. Carreiro and Mr. Knox appeal their convictions and sentences, raising several arguments. We affirm.

## I. FACTS

Because both defendants challenge the sufficiency of the evidence to support their convictions, we set forth the facts in some detail, including all of the reasonable, permissible inferences from the evidence in the light most favorable to the government. *United States v. Shields*, 999 F.2d 1090, 1095 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 877, 127 L.Ed.2d 74 (1994); *United States v. Nesbitt*, 852 F.2d 1502, 1509 (7th Cir.1988), *cert. denied,* 488 U.S. 1015, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989); *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983), *cert. denied,* 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984).

Mr. Carreiro was a Canadian businessman frustrated with the refusal of a Chicago company, Exchange Parts of America, Inc., to pay a $33,000 debt to Mr. Carreiro's company (Silverstone, Ltd.) for the hauling of materials from another Canadian company (Automet Industries, Inc.) to Exchange Parts. Mr. Carreiro hired an attorney to bring suit against Exchange Parts, but the suit languished. Exchange Parts had settled its dispute with Automet, receiving full credit for the freight charges owed to Mr. Carreiro's company, but still did not pay Silverstone. The civil suit produced a default judgment against Exchange Parts, but Exchange Parts filed a petition in bankruptcy before the default judgment became final.

Neither Silverstone nor Mr. Carreiro received official notice from the bankruptcy court of Exchange Parts' filing. Nonetheless, Mr. Carreiro learned of the petition's filing from another creditor and began a long-distance telephonic search for Exchange Parts' vice president of finance, a man named Reding. Mr. Reding did not return Mr. Carreiro's phone calls or respond to a letter Mr. Carreiro faxed to Mr. Reding.

Mr. Carreiro then arranged for Michael Taylor, a former Silverstone driver who had gone into the collection business, to go to Chicago. Mr. Carreiro provided Mr. Taylor with a copy of the settlement between Automet and Exchange Parts and told him to deliver the papers to Leonard Hoppe, Exchange Parts' president. Mr. Taylor travelled to Chicago, where he recruited Mr. Knox to provide transportation in exchange for a share of the recovery. Mr. Knox, in turn, arranged for Alvin McCarver to provide transportation, as well as housing and a telephone at McCarver's house.

Mr. Knox and Mr. Taylor presented themselves at the Exchange Parts office without identifying themselves. Mr. Taylor repeatedly asked to speak with Mr. Hoppe about money owed to Silverstone. Told that neither Mr. Hoppe nor another named co-owner were present, the two men left. Exchange Parts personnel notified their vice-president and attorney of the visit, and their attorney called Silverstone's attorney about the visit and the bankruptcy laws. Silverstone's attorney said he would try to speak with Mr. Carreiro.

The next day, less than an hour after Mr. Carreiro called McCarver's house, Mr. Knox and Mr. Taylor went with Mr. McCarver to Exchange Parts, parking the car so that the license plate could not be seen. Mr. Taylor again asked to see Mr. Hoppe, and was told that Exchange Parts was in litigation, making it illegal to try to collect money from Exchange Parts. Mr. Taylor was told to contact Mr. Carreiro's attorney for confirmation. As Mr. Taylor continued to demand to speak with Mr. Hoppe, an Exchange Parts

---

* The Honorable Robert L. Miller, Jr. of the United States District Court for the Northern District of Indiana is sitting by designation.

employee noted that Mr. Taylor was holding a piece of paper with Mr. Hoppe's license plate number on it. After leaving the business, Mr. Taylor and Mr. McCarver spoke to Mr. Carreiro by car phone, reporting their lack of success and the statement that Exchange Parts was in bankruptcy.

Exchange Parts' attorney again called Mr. Carreiro's attorney to report this visit; Mr. Carreiro's attorney said he would speak to Mr. Carreiro. Mr. Carreiro's attorney sent a letter to Exchange Parts' attorney reporting that Mr. Carreiro had been informed of the bankruptcy filing and its legal effect. Meanwhile, Mr. Hoppe called the police.

The next day, Mr. Carreiro tried to call Mr. Hoppe at Exchange Parts and called Mr. McCarver's house (where Mr. Taylor was staying), as well. Mr. Carreiro's telephone calls to various residences used by Mr. Taylor continued for nearly three weeks.

Five days after their last visit, Mr. Knox and Mr. Taylor again appeared at Exchange Parts and waited overtly in the parking lot. When a security guard approached them, they drove off. A few minutes later, Mr. Knox (identifying himself as "Mr. Ipsis") telephoned Mr. Hoppe at Exchange Parts. He stated that Mr. Carreiro had hired him to collect the debt and that he would do so "one way or another." Mr. Knox reported that he knew what car Mr. Hoppe drove and where Mr. Hoppe lived. Mr. Hoppe declined to meet with Mr. Knox. Mr. Carreiro telephoned Mr. Hoppe's home that night and demanded the debt's payment through a series of certified checks by the following morning.

Early the next morning, two telephone calls were placed from a pay phone near Mr. Hoppe's home, the first to Mr. Carreiro's residence and the second to Silverstone. As Mr. Hoppe walked from his house to his garage, and then as he drove to work that morning, a car with Mr. Knox and Mr. Taylor followed him, with Mr. Knox waving at Mr. Hoppe. When Mr. Taylor shook his fist, Mr. Hoppe decided to pay the debt to Silverstone. He called Mr. Carreiro with word that payment would be made; a few minutes later, Mr. Carreiro telephoned the residence where Mr. Taylor was staying.

Mr. Hoppe obtained the check to pay the debt, but the FBI intervened. When told that sending the check could expose him to prosecution for bankruptcy fraud, Mr. Hoppe agreed to cooperate with the FBI agents. At their request, Mr. Hoppe did not send the check and agreed to allow the FBI to monitor his telephone calls. He called Mr. Carreiro the next day and told him that he could not pay Silverstone because of the bankruptcy, but still hoped to work something out. Mr. Carreiro said Mr. Hoppe should make the check out to another business Mr. Carreiro owned, so Silverstone's name would not appear. Mr. Hoppe said he feared for his family and that Mr. Knox and Mr. Taylor intimidated him; Mr. Carreiro simply replied that Mr. Hoppe should make the check payable to the other company. A few hours later, Mr. Carreiro called Mr. Hoppe with another request for the money, saying his hands were "tied".

During the day's ensuing telephone conversations, Mr. Hoppe told Mr. Carreiro frequently that Exchange Parts' bankruptcy made payment illegal and that he feared Mr. Knox and Mr. Taylor. Mr. Carreiro offered to send false invoices from his other company for Exchange Parts to pay; Mr. Hoppe said that would be a fraud on the bankruptcy court. Mr. Carreiro told Mr. Hoppe that people would be in touch with him. That night, after Mr. Knox and Mr. Taylor drove past Mr. Hoppe's home two or three times, Mr. Knox (again posing as "Mr. Ipsis") telephoned Mr. Hoppe's residence. Mr. Hoppe told Mr. Knox three times that Exchange Parts was in bankruptcy; Mr. Knox said the debt should be paid.

Early the next morning, Mr. Knox and Mr. Taylor knocked loudly on the front door of Mr. Hoppe's residence for about ten minutes while Mr. Hoppe's children were alone in the house. The morning after that incident, a police officer found Mr. Knox and Mr. Taylor sitting in car in front of Mr. Hoppe's home. Mr. Hoppe called Mr. Carreiro and said that he and his family were scared to death, but to send Mr. Carreiro a check would be a federal offense for both of them. Mr. Carreiro asked how Mr. Hoppe intended to pay

and disclosed his knowledge of Exchange Parts' future under its bankruptcy plan. Mr. Hoppe said he would try to find some cash.

Mr. Hoppe and his family left town for the weekend. Shortly after their Sunday night return, "Mr. Ipsis" called Mr. Hoppe from a pay phone to ask whether progress had been made on finding the money. Mr. Carreiro and Mr. Hoppe spoke by phone again the following evening. Mr. Hoppe said he could have the money together by the following Monday; Mr. Carreiro said "Mr. Ipsis" and his associates were getting impatient.

In telephone calls in the ensuing days, Mr. Hoppe and Mr. Carreiro discussed how the payments would be made. Mr. Carreiro eventually agreed to accept a cash payment from Mr. Hoppe in person. On the promised Monday, Mr. Carreiro told Mr. Hoppe to meet him at O'Hare Airport. Mr. Carreiro later changed the rendezvous point to a restaurant. Mr. Carreiro, Mr. Knox, and Mr. Taylor were arrested at that restaurant.

Following a jury trial that spanned two weeks, Mr. Carreiro, Mr. Knox, and Mr. Taylor were convicted on all counts. Mr. Taylor has not appealed. The district court sentenced Mr. Carreiro to 51 months' imprisonment and Mr. Knox to 33 months' imprisonment.

## II. SUFFICIENCY OF THE EVIDENCE

■ Contrary to the appellants' contention, this evidence is sufficient to support their convictions. Evidence is sufficient if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Brown,* 7 F.3d 648, 655 (7th Cir.1993); *see also United States v. Shields,* 999 F.2d at 1095; *United States v. Briscoe,* 896 F.2d 1476, 1504 (7th Cir.1990), *cert. denied,* 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990).

### A. Conspiracy

■ Mr. Knox contends that the evidence is insufficient to establish his participation in a conspiracy to commit extortion. A conspiracy is "an agreement to commit a crime." *United States v. Lechuga,* 994 F.2d

346, 348 (7th Cir.) (en banc), *cert. denied,* —— U.S. ——, 114 S.Ct. 482, 126 L.Ed.2d 433 (1993). A conspiracy's essential elements are a combination or confederation of two or more people formed for the purpose of committing, by their joint effort, a criminal act. *United States v. Badger,* 983 F.2d 1443, 1448 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2391, 124 L.Ed.2d 293 (1993); *United States v. Stodola,* 953 F.2d 266, 270 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992). Mere association with conspirators, knowledge of a conspiracy, and presence during conspiratorial discussions are not sufficient proof. *United States v. Paiz,* 905 F.2d 1014, 1020 (7th Cir.1990), *cert. denied,* 499 U.S. 924, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991).

No direct evidence demonstrates the existence of an agreement to commit extortion or to commit bankruptcy fraud, but the evidence is more than adequate to support an inference that Mr. Knox reached such an agreement with Mr. Carreiro and Mr. Taylor. An agreement to collect the debt by threat or force reasonably can be inferred from the circumstantial evidence regarding the relationship between Mr. Carreiro, Mr. Taylor, and Mr. Knox, their individual overt acts, and the totality of the circumstances. *See United States v. Andrus,* 775 F.2d 825, 853 (7th Cir.1985). Mr. Carreiro hired Mr. Taylor to collect the debt, Mr. Taylor in turn recruited Mr. Knox; Mr. Knox and Mr. Taylor both used implied threats to get Mr. Hoppe to pay the debt; Mr. Carreiro exploited the threats by Mr. Knox and Mr. Taylor; and the telephone records allowed the jury to find that Mr. Taylor, Mr. Knox, and Mr. Carreiro were in constant contact over the course of events. This evidence is more than sufficient to support the jury's finding that Mr. Knox conspired with others to commit attempted extortion.

### B. Attempted Extortion

■ The appellants contend that the government failed to prove attempted extortion. The government needed to prove that the defendants attempted to affect commerce by obtaining the money from Mr. Hoppe, with his consent, and that Mr. Hoppe was induced

by actual or threatened force, violence, or fear. 18 U.S.C. § 1951. The government had to prove that Mr. Hoppe's fear was reasonable, and that the defendants intentionally and knowingly caused that fear or knowingly used it to induce Mr. Hoppe to part with the money. *Sutherland v. O'Malley,* 882 F.2d 1196 (7th Cir.1989). If there is not sufficient evidence that Mr. Hoppe was put in fear, the conviction cannot stand. *United States v. Giampa,* 758 F.2d 928 (3d Cir.1985).

### 1. Mr. Carreiro

Mr. Carreiro argues that because Mr. Hoppe had promised to pay Silverstone before the FBI began recording Mr. Hoppe's conversations, the recorded conversations cannot be said to have induced Mr. Hoppe to pay. He also contends that it cannot be presumed that Mr. Hoppe agreed to pay out of fear since Mr. Hoppe might have felt an obligation to pay the debt. These arguments ignore Mr. Hoppe's testimony. Mr. Hoppe testified repeatedly that he agreed to pay out of fear; that testimony was sufficient to establish that he was motivated by fear.

Mr. Carreiro argues that if fear motivated Mr. Hoppe, that fear was only the product of Mr. Taylor's clenched fist as Mr. Taylor and Mr. Knox drove past Mr. Hoppe. He argues that if such a fear was reasonable, it cannot be attributed to him because the government did not prove that he knew of, and knowingly exploited, Mr. Taylor's gesture. The jury, however, reasonably could infer that Mr. Carreiro was aware of the cause of Mr. Hoppe's fear since Mr. Carreiro hired Mr. Taylor to collect the debt and was in constant telephonic contact with Mr. Knox and Mr. Taylor. More directly, Mr. Hoppe testified that he told Mr. Carreiro during telephone conversations that he was in fear.

■ Further, Mr. Carreiro's contention ignores the rule of *Pinkerton v. United States,* 328 U.S. 640, 647–648, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946), under which a co-conspirator's actions in furtherance of a conspiracy are attributed to other co-conspirators. Mr. Carreiro need not personally have caused Mr. Hoppe's fear; that he exploited that fear is sufficient to establish a violation of the Hobbs Act. *See United States v. Lisinski,* 728 F.2d 887, 890–892 (7th Cir.), *cert. denied,* 469 U.S. 832, 105 S.Ct. 122, 83 L.Ed.2d 64 (1984). Mr. Carreiro argues that he did not try to exploit Mr. Hoppe's fear of Mr. Knox or Mr. Taylor, but the jury could have found to the contrary. Mr. Carreiro told Mr. Hoppe he could not control the actions of Mr. Knox and Mr. Taylor unless Mr. Hoppe paid the debt.

Mr. Carreiro argues that any fear Mr. Hoppe may have experienced during the time the FBI was protecting him could not have been reasonable. Mr. Hoppe testified that he did not know the extent of the protection the FBI was giving his family. Further, the crime of attempted extortion was completed upon the defendants' first use of threats to induce payments, *see United States v. Rindone,* 631 F.2d 491, 493 (7th Cir.1980), which were made before the FBI's involvement.

### 2. Mr. Knox

■ Mr. Knox contends that the government did not prove specific intent, as it was required to under *United States v. Tuchow,* 768 F.2d 855 (7th Cir.1985); *but see United States v. Schweihs,* 971 F.2d 1302 (7th Cir. 1992). He contends that the government did not prove that he used actual or threatened force, violence, or fear of an implied threat of force. To prove an implied threat of force, the government would have to prove that Mr. Knox made statements or acted such as a reasonable person would understand to be a threat of force. *Sutherland v. O'Malley,* 882 F.2d 1196 (7th Cir.1989); *United States v. Schweihs,* 971 F.2d at 1324–1325. Mr. Knox contends that none of his actions or statements would be so understood: he never threatened Mr. Hoppe or any other person with Exchange Parts; he did not act in a threatening or intimidating way in his visits to Exchange Parts and Mr. Hoppe's residence; employees testified that Mr. Knox did not threaten or intimidate them or cause them fear; Mr. Hoppe admitted that he was not threatened by Mr. Knox's recorded calls.

Were there no other evidence, Mr. Knox's contention might be more appealing. Mr.

Hoppe testified, however, that an unrecorded call, in which Mr. Knox made references to Mr. Hoppe's home and car, was threatening. Mr. Knox also ignores his threatening telephone calls to Mr. Hoppe while posing as Mr. Ipsis. Moreover, Mr. Taylor's threatening gesture and Mr. Carreiro's threatening conversations are attributable to Mr. Knox. *See Pinkerton v. United States,* 328 U.S. 640, 647–648, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946).

The threatening conversations, Mr. Taylor's fist gesture, Mr. Knox's implicit threat that he would "stay on top" of the situation, the stalking of Mr. Hoppe, and the ten minutes of pounding loudly on Mr. Hoppe's front door all support a finding that the defendants attempted to extort payment from Mr. Hoppe.

### 3. Effect on Interstate Commerce

 Mr. Carreiro argues that the evidence does not demonstrate a sufficient effect on interstate commerce. The government relied on the "depletion of assets" theory at trial to establish a connection between the attempted extortion and interstate commerce. *See United States v. Elders,* 569 F.2d 1020, 1023–1024 (7th Cir.1978). Any economic benefit conferred on Exchange Parts by its credit had long been exhausted by the time of the extortion acts. Exchange Parts' payment of the debt would have reduced its ability to purchase goods in interstate commerce. Mr. Carreiro's contention that Exchange Parts was holding Silverstone's money in a quasi-constructive trust has no merit: Exchange Parts received only a credit, and no money, from Automet, so there was no *res* upon which a trust could be imposed. There could be no constructive trust under Illinois law without a *res. People ex rel. Hartigan v. Candy Club,* 149 Ill. App.3d 498, 502, 103 Ill.Dec. 167, 501 N.E.2d 188 (1986). The evidence was sufficient to support a finding of an effect on interstate commerce.

Mr. Carreiro contends that commerce could not have been affected by the payment of money Exchange Parts received for purpose of settling its obligation with Silverstone. We disagree. Exchange Parts had received a credit to compensate it for its liability to Silverstone as part of a settlement agreement with Automet, but did not pay Silverstone. Exchange Parts owed Silverstone the money for more than a year. There was at least a realistic probability at the time of the extortionate acts that Exchange Parts' payment of the debt would affect interstate commerce, although the effect may have been minor. *United States v. Mattson,* 671 F.2d 1020, 1023 (7th Cir.1982); *United States v. Elders,* 569 F.2d at 1023–1024. The simple passage of time supports a finding that payment of the debt, more than a year after Exchange Parts received the credit, would deplete Exchange Parts' assets and affect interstate commerce.

### 4. Manufactured Jurisdiction

 The appellants contend that their attempted extortion convictions should be reversed because the government manufactured jurisdiction by manufacturing the effect on commerce. Mr. Carreiro also contends that his conviction for interstate travel to commit extortion should be reversed because the government manufactured jurisdiction by inducing his travel from Canada to United States. This issue was not raised in the district court. Because "an issue raised for the first time on appeal is considered forfeited," the court reviews it only for plain error. *United States v. Lilly,* 37 F.3d 1222, 1225 (7th Cir.1994) (citation omitted). The defendants have not established plain error.

Mr. Carreiro contends that *United States v. Archer,* 486 F.2d 670 (2d Cir.1973), applies because he was entrapped and because he felt constrained to travel to Chicago. We disagree. In *Archer,* the Second Circuit held that the government improperly manufactured jurisdiction because interstate telephone calls, initiated by an undercover agent, served no purpose that could not have been served by intrastate telephone calls. 486 F.2d at 682–683. We have questioned *Archer*'s reasoning, *see, e.g., United States v. Podolsky,* 798 F.2d 177, 180 (7th Cir.1986), and the subsequent history of *Archer* has been "characterized by the universal effort of other courts to distinguish, rather than follow...." *United States v. Shields,* 793

F.Supp. 768, 780 (N.D.Ill.1991). We have questioned the applicability of *Archer* in the absence of the suggestion of entrapment and the cancelling of an element of the offense. *See United States v. Shields,* 999 F.2d 1090, 1098 (7th Cir.1993); *United States v. Muskovsky,* 863 F.2d 1319, 1326 (7th Cir.1988), *cert. denied,* 489 U.S. 1067, 109 S.Ct. 1345, 103 L.Ed.2d 813 (1989).

In *United States v. Peters,* 952 F.2d 960, 964 (7th Cir.), *cert. denied,* 503 U.S. 911, 112 S.Ct. 1277, 117 L.Ed.2d 503 (1992), we held that the case did not fall within *Archer*'s reach because the governmental act that allegedly manufactured jurisdiction was not solely motivated with the purpose of establishing jurisdiction; the act also was motivated by other "legitimate" purposes. 952 F.2d at 963–964. In *Peters,* an undercover agent who posed as a buyer of stolen trucks in the Chicago area created an opportunity for the delivery of one stolen truck in northwest Indiana. 952 F.2d at 963. We noted that the agent "merely furnished the defendant with 'an opportunity to complete [his] scheme,'" and that the evidence showed that the defendant had the desire to dispose of the truck where the opportunity arose. 952 F.2d at 963.

Assuming it remains good law, *Archer* does not control our decision in the case because the acts that allegedly manufactured jurisdiction served two other ends. Although Mr. Hoppe had agreed to pay Mr. Carreiro from personal funds before government intervention, the record does not establish that the government's intent to establish jurisdiction was the sole basis for the payment of Exchange Parts' debt from Exchange Parts' assets rather than from Mr. Hoppe's personal assets or for Mr. Hoppe's insistence that Mr. Carreiro travel to the United States for payment. Mr. Hoppe served two ends independent of "manufacturing" jurisdiction by insisting that payment come from Exchange Parts' assets: (1) he enabled investigators to determine whether Mr. Carreiro intended to collect the money regardless of his conduct's legality; and (2) he enabled investigators to verify the accuracy of his accounts of prior dealings with Mr. Carreiro. Similarly, Mr. Hoppe's offer to pay the debt in cash if Mr. Carreiro came to the United States served two purposes other than manufacturing jurisdiction: (1) it tested Mr. Carreiro's decision to play a personal role in collection; and (2) it brought Mr. Carreiro into a jurisdiction where he could be easily arrested.

Because the appellants have not established either that Mr. Hoppe's insistence that the debt be paid from Exchange Parts' assets rather than his personal assets or that Mr. Hoppe's offer to pay Mr. Carreiro in cash if Mr. Carreiro travelled to the United States served no purpose other than manufacturing jurisdiction, Mr. Hoppe's actions do not bring this cause within *Archer*'s reach.

### C. Bankruptcy Fraud

■ The appellants contend that the government failed to prove bankruptcy fraud because it was not proven that they had notice of Exchange Parts' bankruptcy. Mr. Knox contends that the government did not prove that anyone told him that the bankruptcy laws prohibited .the payment of a pre-bankruptcy debt without the bankruptcy court's permission. Both appellants contend that the government failed to prove that the money Mr. Carreiro sought was pre-petition debt.

Although Mr. Carreiro never received official notice of Exchange Parts' bankruptcy petition, there was ample evidence from which the jury could find that he had actual notice of Exchange Parts' bankruptcy. His attorney told Exchange Parts' attorney that Mr. Carreiro "has now been informed that all collection activity, not just legal action, must cease upon a bankruptcy filing and I am confident that there will be none," and that Mr. Carreiro had received copies of documents from another creditor of Exchange Parts. In the recorded telephone conversations, Mr. Hoppe told Mr. Carreiro that his company was in bankruptcy. Mr. Carreiro testified that he did not believe much of what Mr. Hoppe told him and that he thought Mr. Hoppe was making another excuse, but what Mr. Carreiro believed is a matter for resolution by the factfinder, not us. Finally, Mr. Carreiro's own statements support the inference that he knew of Exchange Parts' bankruptcy: when, during a taped telephone con-

versation, Mr. Hoppe proposed that Exchange Parts pay the debt after the conclusion of the bankruptcy, Mr. Carreiro rejected the proposal and responded that "by that time Norman Morse would have taken over the company. Am I correct?", disclosing his knowledge of the reorganization plan.

Mr. Knox argues that he was not a party to Mr. Carreiro's telephone conversations with Mr. Hoppe and that there is no evidence that he was aware of Mr. Hoppe's statements to Mr. Carreiro that Exchange Parts was in bankruptcy. Telephone records, however, support an inference that Mr. Knox and Mr. Carreiro were in constant telephonic contact and so support the inference that Mr. Carreiro provided Mr. Knox with information regarding Exchange Parts' bankruptcy during any number of those telephone conversations. More to the point, Mr. Knox was advised of Exchange Parts' bankruptcy on at least three occasions. On June 24, 1991, Mr. Hoppe advised Mr. Knox, posing as a Mr. Ipsis, that Exchange Parts was in bankruptcy. Two days later, Mr. Hoppe again advised Mr. Ipsis/Knox that Exchange Parts was in "Chapter 11 bankruptcy ... the bank wouldn't let me write a check out", to which Mr. Knox responded, "you've had the time, or the company has...." During that conversation, Mr. Knox referred to the rebilling scheme which Mr. Carreiro had suggested to Mr. Hoppe in an effort to circumvent Exchange Parts' bankruptcy. Although it is impermissible to presume that Mr. Knox understood bankruptcy proceedings, *United States v. Goodstein*, 883 F.2d 1362, 1371 (7th Cir.1989), *cert. denied*, 494 U.S. 1007, 110 S.Ct. 1305, 108 L.Ed.2d 481 (1990), the evidence supports an inference that Mr. Knox knew he could not collect the debt from Exchange Parts which was in bankruptcy.

Thus, this case is unlike *United States v. Guiliano*, 644 F.2d 85 (2d Cir.1981), in which a defendant's conviction was reversed because the government had not proven that the defendant was aware of either the bankruptcy or the appointment of a trustee. Mr. Carreiro and Mr. Knox, in contrast, were made aware of Exchange Parts' bankruptcy.

Finally, the appellants offer no authority to support their contention that the government was required to prove that Exchange Parts' debt to Silverstone was a pre-bankruptcy petition debt. The statute under which the defendants were convicted, 18 U.S.C. § 152, does not require that the fraudulently obtained property be a pre-petition debt.

### III. MISTRIAL

■ During questioning by the government, Mr. Hoppe volunteered that he thought that Mr. Knox was carrying out "a contract" on him. Mr. Knox claims the district court abused its discretion in denying his motion for mistrial based on that comment. He contends that there was no factual basis for Mr. Hoppe's remark, that the government made no effort to provide any factual basis during the trial, and that no counsel said that the accusation was true.

Mr. Knox contends that the remark was unfairly prejudicial to him and poisoned the trial's atmosphere, *see Patel v. United States*, 19 F.3d 1231, 1237 (7th Cir.1994); *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986), particularly because the evidence made this a "close case". *United States v. Robinson*, 8 F.3d 398, 414 (7th Cir.1993); *United States v. Elizondo*, 920 F.2d 1308, 1316 (7th Cir.1990). We disagree. The victim's state of mind is relevant to the crime for extortion, so Mr. Hoppe's testimony about his fear to the jury was proper, even if Mr. Hoppe had misapprehended the situation.

In any event, the court instructed the jury to disregard Mr. Hoppe's comment and stated that it did not think that the evidence supported Mr. Hoppe's choice of terminology. The court's instruction cured any unfair prejudice to Mr. Knox. The jury is presumed to have followed the court's instruction. *United States v. Mealy*, 851 F.2d 890, 902–03 (7th Cir.1988). The district court's denial of Mr. Knox's motion for mistrial was not an abuse of discretion. *See United States v. Harris*, 2 F.3d 1452, 1456 (7th Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 481, 126 L.Ed.2d 432 (1993).

### IV. PROSECUTORIAL MISCONDUCT

■ When Mr. Taylor shook his fist, Mr. Hoppe was on his way to meet Norman

Morris, who did not testify at trial. In closing argument, Mr. Knox's counsel raised the question of why Mr. Morris did not testify. In rebuttal, the prosecutor responded that Mr. Morris was afraid, and that if Mr. Morris could offer anything helpful to the defense, the defendants would have presented him as a witness. The prosecutor also argued in rebuttal that, given Mr. Carreiro's tone of voice during taped conversations with Mr. Hoppe, the jury could infer that Mr. Carreiro "would reach through those lines right through and grab Leonard Hoppe"; the district court sustained an objection to that remark. The appellants contend that the district court abused its discretion in denying their motions for a new trial following these allegedly inflammatory remarks. Both appellants contend that the prosecutor's argument regarding a "missing" witness deprived them of a fair trial, and Mr. Knox complains of the "reach through those lines" comments. The government contends that the comments were proper, and if improper, any error was harmless.

### A. Missing Witness Comment

■ We review the district court's allowance of a comment on a "missing witness" for abuse of discretion. *United States v. Addo*, 989 F.2d 238, 242 (7th Cir.1993); *United States v. Sblendorio*, 830 F.2d 1382, 1394 (7th Cir.1987), *cert. denied*, 484 U.S. 1068, 108 S.Ct. 1034, 98 L.Ed.2d 998 (1988). The same standard governs our review of a district court's denial of a motion for a new trial. *United States v. Reed*, 986 F.2d 191, 192–93 (7th Cir.1993).

■ We apply a two-part test when reviewing prosecutorial remarks made during closing argument. We first determine whether the remark, considered in isolation, was improper. *United States v. Swiatek*, 819 F.2d 721, 730 (7th Cir.), *cert. denied*, 484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987). If so, we examine the remark in light of the entire record to determine whether the defendant was deprived of a fair trial. *United States v. Swiatek*, 819 F.2d at 730. When viewing the entire record, we consider (1) the nature and seriousness of the remark; (2) whether defense counsel invited the prosecu-

tor's remark; (3) whether the court instructed the jury to disregard the improper remark; (4) whether the defendant had an opportunity to rebut the improper remark; and (5) the weight of the evidence against the defendant. *United States v. Smith*, 26 F.3d 739, 755–56 (7th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 680, 130 L.Ed.2d 612 (1994).

The first remark in question, made during the government's rebuttal, concerns the anticipated testimony of Mr. Morris, whom Mr. Hoppe testified was with him when Mr. Taylor shook his fist at Mr. Hoppe. The district court overruled the defendants' objection to the remark. In *United States v. Sblendorio*, 830 F.2d at 1393–1394, we held that the prosecutor could comment on the defendant's ability to call a witness if the defendant chose to do so, overruling *United States v. Pollard*, 790 F.2d 1309 (7th Cir.1986), and *United States v. Wheeler*, 800 F.2d 100 (7th Cir. 1986), to the extent that they held otherwise. In *Sblendorio*, the prosecutor argued that the defendants had no burden and did not have to prove a thing, but that they have subpoena power. 830 F.2d at 1390–1391. As in *Sblendorio*, the prosecutor in this case noted that the defendants had no burden of proof, but commented that they, like the government, had subpoena power. Under *Sblendorio*, that remark was not improper.

■ Mr. Morris was not peculiarly within the government's power to produce. In certain circumstances, a party may comment on the other party's failure to call a witness. If "[1] a party has it peculiarly within its power to produce witnesses [2] whose testimony would elucidate a transaction, the fact that he does not do it creates a presumption that the testimony, if produced, would be unfavorable." *United States v. Addo*, 989 F.2d at 242 (quotation omitted); *United States v. Dahdah*, 864 F.2d 55, 60 (7th Cir.1988), *cert. denied*, 489 U.S. 1087, 109 S.Ct. 1550, 103 L.Ed.2d 853 (1989). A witness is peculiarly within the government's control if the witness is "only physically available to the government or that because of the witness' relationship with the [government], his ... testimony is, in pragmatic terms, only available to the other side." *United States v. Romo*, 914 F.2d 889, 893–94

(7th Cir.1990) (citation omitted), *cert. denied,* 498 U.S. 1122, 111 S.Ct. 1078, 112 L.Ed.2d 1183 (1991); *see also United States v. MMR Corp.,* 907 F.2d 489, 502 (5th Cir.1990), *cert. denied,* 499 U.S. 936, 111 S.Ct. 1388, 113 L.Ed.2d 445 (1991) (a witness' relationship to one party may make him available to that party).

Any bias toward Mr. Hoppe arising from Mr. Morris' negotiations to purchase Mr. Hoppe's company does not mean he was in the government's control. *See United States v. Addo,* 989 F.2d at 242. That the FBI interviewed Mr. Morris and defense counsel did not interview Mr. Morris does not establish that Mr. Morris was physically available only to the government or that his testimony was available only to the government. Unlike *United States v. MMR Corp.,* 907 F.2d 489, upon which the appellants rely, Mr. Morris had no special relationship with either Mr. Hoppe or the government. Even government informants are not peculiarly within the government's control if the defendant can subpoena them as witnesses. *United States v. Cochran,* 955 F.2d 1116, 1123–1124 (7th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 460, 121 L.Ed.2d 368 (1992). Because the facts before us are insufficient to establish that Mr. Morris was peculiarly within the government's control, the prosecutor's missing witness remark was proper.

■ Mr. Carreiro contends that the government compounded the prejudice by placing words in Mr. Morris' mouth that were not supported in the record: the prosecutor told the jury that Mr. Morris used a false name since he feared Mr. Carreiro, but Mr. Morris said he used a false name because he didn't want to get involved. The prosecutor's "spin" as to why Mr. Morris did not want to get involved is not so prejudicial or serious to warrant a new trial.

### B. Reaching Through Phone Lines

■ Mr. Knox contends that the district court abused its discretion, and denied Mr. Knox a fair trial, in denying his motion for a new trial following the prosecutor's comment in rebuttal that Mr. Carreiro would reach through the phone lines and grab Mr. Hoppe. He contends that the curative instruction was insufficient to cure any resulting prejudice to him.

■ Counsel cannot argue what a defendant would have done if he had been able unless there is testimony to support his argument, *see United States v. Henry,* 2 F.3d 792, 795 (7th Cir.1993), but may argue reasonable inferences based on the evidence. *United States v. Spivey,* 859 F.2d 461, 466 (7th Cir. 1988). Given the absence of any insanity defense, we cannot imagine that anyone in the courtroom would be induced to believe that Mr. Carreiro actually intended to transport himself through an international telephone wire from Toronto to Chicago to assault Mr. Hoppe. The prosecutor's comment was hyperbole, designed to describe a state of mind easily inferred from the evidence.

■ Mr. Knox contends that the curative instruction did not cure any resulting prejudice to him, but does not tell us why. Given the presumption that the jury follows curative instructions, *United States v. Easley,* 994 F.2d 1241, 1246 (7th Cir.1993), Mr. Knox's conclusory argument is an insufficient basis for us to find that the jury failed to follow the court's curative instruction.

## V. THE SENTENCES

Mr. Carreiro contends that the district court erred in sentencing him. Mr. Knox adopts Mr. Carreiro's arguments regarding the calculation of his sentence under the guidelines and the amount of money involved in the offense, but Mr. Knox did not raise the sentence calculation issue in the district court. Accordingly, Mr. Knox has waived his right to have sentencing errors reviewed for anything other than plain error. In any event, we find no error.

■ First, Mr. Carreiro contends that the sentencing judge erred in applying U.S.S.G. § 2B3.2 because there was no evidence of any express or implied threat by Mr. Carreiro. As we explained above, sufficient evidence supported a finding of an express or implied threat by Mr. Carreiro, who organized the conspiracy to use intimidation and threats to extort Mr. Hoppe. The jury reasonably found that Mr. Carreiro knew of,

approved of, and exploited the threats by Mr. Knox and Mr. Taylor. The evidence was sufficient to allow the sentencing judge to so find, as well.

██ Second, Mr. Carreiro contends that the sentencing judge erred in enhancing his sentence based upon the "amount of loss" because there was no potential "loss" to the victim. This enhancement was justified under U.S.S.G. § 2B3.2(b)(2), which is framed in the conjunctive: the guideline only requires that the amount demanded exceed $10,000 or that the loss to the victim exceed $10,000. Even if the victim's loss was zero, the $33,000 demanded exceeded $10,000 and, therefore, U.S.S.G. § 2B3.2(b)(2) was satisfied.

██ Mr. Carreiro contends that a downward departure was proper because he was entitled to payment of the debt. We disagree. The extortioner's claim or right (whether valid or invalid) to the money is an irrelevant consideration. *See United States v. Agnes,* 753 F.2d 293, 302 (3d Cir.1985); *see also United States v. Castor,* 937 F.2d 293, 297–298 (7th Cir.1991) ("you cannot beat someone up to collect a debt, even if you believe he owes it to you"). The sentencing judge considered the debt's validity in selecting the sentence within the applicable range; Mr. Carreiro was entitled to no more.

██ Lastly, Mr. Carreiro contends that the sentencing judge erred in finding that he obstructed justice by testifying untruthfully because he later clarified his testimony. Mr. Carreiro testified that he did not hear Mr. Hoppe say that he was afraid during their telephone conversations, and that Mr. Carreiro thought Mr. Taylor had a collection business. We review the district court's factual findings for clear error, *United States v. Emenogha,* 1 F.3d 473, 482 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 901, 127 L.Ed.2d 92 (1994).

The sentencing judge found that Mr. Carreiro's testimony that he never heard Mr. Hoppe tell him that he was scared or being threatened was false. That finding was based on the quality of the tapes of the recorded telephone conversations, the frequency with which Mr. Hoppe advised Mr. Carreiro that he was afraid or that he was being threatened, that Mr. Carreiro never said he was having difficulty hearing Mr. Hoppe during the conversations, and that Mr. Carreiro had hired the individuals who were threatening Mr. Hoppe. The finding was not clearly erroneous.

The sentencing judge found Mr. Carreiro's testimony that he was going to pay Mr. Taylor $10,000 to deliver some papers false. The judge found a strong inference, based on the totality of the evidence, that Mr. Carreiro was aware of what Mr. Knox and Mr. Taylor were doing. That finding was not clearly erroneous. The sentencing judge found Mr. Carreiro's testimony that he thought Mr. Hoppe referred to Mr. Knox and Mr. Taylor as "goofs" rather than "goons" to be false, reasoning that the testimony was Mr. Carreiro's attempt to counter his knowledge about the actions of the people he had sent to collect the debt and his knowledge that Mr. Hoppe was scared. As with the testimony that Mr. Carreiro never heard Mr. Hoppe say he was scared or threatened, the finding that this testimony was false was not clear error.

Finally, Mr. Carreiro testified that he did not hear Mr. Hoppe say that he was in bankruptcy during their telephone conversations, but he also testified that he did not believe Mr. Hoppe when he said that Exchange Parts was in bankruptcy.

The district court did not commit clear error in finding that Mr. Carreiro obstructed justice by committing perjury at trial and did not misapply the sentencing guidelines in sentencing either Mr. Carreiro or Mr. Knox.

## VI. CONCLUSION

Finding no error, much less reversible error, in this record, we AFFIRM the convictions and sentences of Armando Carreiro and Mark Knox.